UNITED STATES, Appellant,

v.

George S. BENNETT, Jr.,
Defendant, Appellee.

No. 93–1732.

United States Court of Appeals,
First Circuit.

Heard June 6, 1994.

Decided Sept. 20, 1994.

William P. Stimson, Asst. U.S. Atty., Economic Crimes Div., with whom Donald K. Stern, U.S. Atty., Boston, MA, was on brief, for appellant.

Morris M. Goldings, with whom John F. Aylmer, II and Mahoney, Hawkes & Goldings, Boston, MA, were on brief, for appellee.

Before SELYA, Circuit Judge,
CAMPBELL, Senior Circuit Judge, and
LAGUEUX, District Judge.*

LEVIN H. CAMPBELL, Senior Circuit Judge.

George S. Bennett, Jr., defendant-appellee, was formerly a general manager, officer, and director of Daniel Webster Mortgage Company, Inc., which originated, underwrote, and sold mortgage loans. Bennett was also an attorney. On December 2, 1991, Bennett was charged, in a nine-count indictment, with violating the bank fraud statute, 18 U.S.C. § 1344 (1988).[1] The indictment alleged that, from August 1988 until October 1989, Bennett obtained nine loans—corresponding to the nine counts—totaling $900,000 by, among other things, providing knowingly false and misleading information concerning the identity of the borrower or borrowers and by concealing his and his wife's interest in the loans.

On February 16, 1993, a jury trial began in the United States District Court for the District of Massachusetts. Eight days later, the jury found Bennett guilty on all nine counts. Following a sentencing hearing on May 18 and 19, 1993, the district court sentenced Bennett to twenty-four months probation with six months home detention. He was also ordered to pay a special assessment of $450 pursuant to 18 U.S.C. § 3013 (1988). Judgment was entered on May 24, 1993.

---

\* Of the District of Rhode Island, sitting by designation.

1. 18 U.S.C. § 1344 provides:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—
 (1) to defraud a financial institution; or

 (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

The Government appeals from the sentence.[2] We vacate and remand for resentencing.

## I.

### BACKGROUND

#### A. The Scheme

Daniel Webster Mortgage Company, Inc. ("Daniel Webster"), which maintained a place of business in Marshfield, Massachusetts, originated and underwrote residential mortgage loans for consumers. To finance its mortgage underwriting activities, Daniel Webster borrowed money under lines-of-credit that it maintained with Plymouth Federal Savings Bank ("Plymouth Federal")—a federal mutual savings bank with its principal place of business in Plymouth, Massachusetts—and New Bedford Institution for Savings (NBIS)—a state-chartered bank based in New Bedford, Massachusetts.[3] To obtain line-of-credit advances, Daniel Webster needed only to contact the banks by telephone and provide a borrower's name and an amount to be disbursed. After making a mortgage loan, Daniel Webster would assign the promissory note and the accompanying mortgage from its customer to whichever bank advanced the funds. Daniel Webster would also record the mortgage and the assignment at the appropriate registry of deeds. When the mortgage loan was sold on the secondary market, Daniel Webster would use the proceeds to repay the principal borrowed from the lending bank, plus accrued interest.

George S. Bennett, Jr. was general manager of Daniel Webster from August 1985 until May 3, 1990, when he was asked to resign. He was also an officer of the company from May 1986 and a director from April 1987. On May 20, 1988, Bennett obtained two mortgage loans from Daniel Webster, each for $159,000. Bennett used the proceeds to purchase two parcels of real property in Hing-ham, Massachusetts. Title to these parcels was taken in the names of two nominee realty trusts, Prospect Woods Realty Trust and Prospect Forest Realty Trust. Bennett and his wife, Patricia A. Bennett, were the sole beneficiaries of each trust, and Mrs. Bennett was appointed trustee. Bennett's plan was to develop two homes on the parcels, occupy one, and sell the other.

In or about September 1988, Bennett applied directly to Robert E. Dawley, then-president of Plymouth Federal, for financing to construct the two residences on the Hing-ham property. He sought loans of $410,000 and $425,000. Dawley thought that Plymouth Federal should not lend Bennett this money. Accordingly, after consulting with Plymouth Federal's loan committee, Dawley rejected Bennett's applications.

Thereafter, Bennett used his position with Daniel Webster to cause the banks to lend him money under their lines-of-credit.[4] On more than ten separate occasions, Bennett obtained advances under the lines-of-credit by misrepresenting to the banks that he was financing mortgage loans underwritten by Daniel Webster in its regular course of business. To conceal his personal interest in the loans, Bennett, on many occasions, gave the banks fictitious borrower names such as "Woods," "Forest," "Foster," "Floras," "Powers," and "Kallan." Although Bennett and/or his wife executed promissory notes and mortgages for each new loan, Bennett failed to record any of the mortgages or assign them to the banks. Consequently, the line-of-credit advances were effectively unsecured, and Bennett avoided creating a public record of his borrowing activity. Bennett also created a lender loan file for each new loan that contained "filler" documents—such as settlement statements, credit applications, title insurance policies, and real estate appraisals—that, upon close inspection, bore no relationship to the particular loan. Rather, many of

---

2. Bennett cross-appealed from the conviction, but the cross-appeal was later voluntarily dismissed pursuant to Fed.R.App.P. 42(b).

3. We will refer to Plymouth Federal and NBIS collectively as "the banks."

4. Eight of the loans described in the indictment were originally funded using advances from the Plymouth Federal line-of-credit, and one such loan was funded using an advance from the NBIS line-of-credit. By May 1990, however, Plymouth Federal had purchased all the loans at issue that had been charged to the NBIS line-of-credit.

690

these documents were photocopies of the materials prepared in connection with the two $159,000 loans obtained by Bennett in May 1988. To avoid detection, Bennett kept the promissory notes, mortgages, and loan files in his personal possession.

In or about March and April 1990, the Federal Deposit Insurance Corporation (FDIC) examined Plymouth Federal, including the Daniel Webster line-of-credit. One examiner demanded the supporting documentation for a $125,000 advance under the name "Bennett"—Count 7 of the indictment. In response, Bennett provided, among other things, a promissory note, a mortgage, and an assignment of the mortgage to Plymouth Federal. The mortgage and the assignment had recording stamps, bearing instrument numbers 36241 and 36242, indicating that they had been received by the Plymouth County Registry of Deeds on May 12, 1989, at 12:12 p.m. On further inspection, however, the mortgage and the assignment were found to be unrecorded, and the recording stamps to have been forged. A search at the Plymouth County Registry of Deeds revealed that the instrument numbers belonged to documents filed in an unrelated transaction.

The full extent of Bennett's borrowing was revealed on or about May 3, 1990. Plymouth Federal thereupon terminated its line-of-credit, putting Daniel Webster out of business. Bennett was asked to resign from Daniel Webster.

On May 22, 1990, Plymouth Federal and Daniel Webster sued Bennett, claiming, *inter alia,* that he had committed fraud. Bennett denied liability. On February 1, 1991, the parties entered into a settlement agreement. Bennett agreed to turn over to Plymouth Federal certain cash and other property, including the part of the Hingham property that had not earlier been sold. The district court found the value of the cash and property transferred in the settlement to be "at least" $660,000.

B. *The Flow of Funds*

During the civil law suit, Bennett, in answers to interrogatories, listed the loans that he had obtained from May 20, 1988, through March 1, 1990. The Government provides the following chart, which includes the nine transactions, designated A through I, charged in the indictment:

| Date | Whether Charged/ Design. | Amount | "Borrower Name" on Bank Docs. | Date Princ. Repaid | Princ. Balance (5–3–90) |
|---|---|---|---|---|---|
| 5–20–88 | no | $159,000 | Bennett | — | $159,000 |
| 5–20–88 | no | $159,000 | Bennett | — | 159,000 |
| 7–5–88 | no | 180,000 | Bennett | 9–30–88 | |
| 8–11–88 | yes (A) | 40,000 | Woods | 9–22–88 | |
| 9–22–88 | no | 185,000 | Bennett | 10–13–88 | |
| 9–22–88 | yes (B) | 90,000 | Forest | 7–7–89 | |
| 10–4–88 | no | 100,000 | Bennett | — | 100,000 |
| 10–4–88 | yes (C) | 141,700 | Woods | 7–7–89 | |
| 10–4–88 | yes (D) | 145,300 | Foster | 7–7–89 | |
| 3–31–89 | yes (E) | 75,000 | Woods | — | 75,000 [5] |
| 3–31–89 | yes (F) | 105,000 | Floras | 7–7–89 | |
| 5–12–89 | yes (G) | 125,000 | Bennett | — | 125,000 |
| 8–2–89 | yes (H) | 67,000 | Powers | 9–30–89 | |
| 10–2–89 | yes (I) | 111,000 | Kallan | — | 111,000 |
| 3–1–90 | no | 108,000 | Sou | — | 108,000 |
| | | $1,791,000 | | | $837,000 |

---

5. The Government's appellate brief indicates that this loan was actually repaid on September 30, 1989. Bennett states in his brief, however, that he did not repay the $75,000 loan until February 1, 1991. This later date is consistent with representations made by the Government to the district court. Accordingly, we will assume that the $75,000 loan was still outstanding as of May 3, 1990. If our assumption is incorrect, the district

As the Government's chart indicates, several of the loans were repaid before May 3, 1990, the date when Bennett's offense was discovered. According to Bennett, the remaining loans were repaid when he entered into the settlement agreement with Daniel Webster and Plymouth Federal on February 1, 1991.

## C. *Sentencing*

At sentencing, the Government maintained that, because Bennett's scheme to defraud continued after the November 1, 1989, amendment to the loss table in U.S.S.G. § 2F1.1(b)(1), there was no *ex post facto* problem created by using—as is ordinarily done—the version of the Guidelines Manual that was in effect (*i.e.*, November 1, 1992) when Bennett was sentenced. The Government also argued that (1) in addition to the $900,000 in charged loans, the district court should consider $1,016,000 in other loans as relevant conduct, for a total loss of $1,916,000;[6] (2) the $1,916,000 loss figure should not be reduced to reflect any repayments made by Bennett because this was not a "fraudulent loan application" case within the meaning of U.S.S.G. § 2F1.1, comment. (n. 7(b)); (3) Bennett did nothing to manifest any appreciation of the criminality of his conduct; and (4) the district court should apply upward adjustments to the offense level under U.S.S.G. §§ 2F1.1(b)(2) and 3B1.3. Accordingly, the Government urged the district court to determine Bennett's Total Offense Level as follows:

| | |
|---|---|
| § 2F1.1(a) (base offense level) | 6 |
| § 2F1.1(b)(1)(M) (loss of $1,916,000) | 12 |
| § 2F1.1(b)(2) (more than minimal planning) | 2 |
| § 3B1.3 (abuse of position of trust) | 2 |
| TOTAL OFFENSE LEVEL | 22 |

This offense level, says the Government, would have resulted in a sentencing range of 41 to 51 months incarceration and a fine range of $7,500 to $75,000.

The district court refused to accept the Government's position. Finding that the last date of the offense of conviction was October 2, 1989, it decided to use. the. November 1, 1988, Guidelines Manual—which contained the loss table in effect prior to the November 1, 1989, amendment—to avoid violating the Ex Post Facto Clause of the United States Constitution. Moreover, for purposes of calculating the loss to the banks, the district court, after a two-day sentencing hearing during which it considered the issue, included only those loans, totaling $900,000, that had been charged in the indictment. From this gross loss figure, the district court subtracted (1) the amount of the charged loans that Bennett had repaid prior to the May 1990 discovery of his crime (*i.e.*, $589,000), and (2) the value of the February 1991 settlement with Plymouth Federal and Daniel Webster.[7] Accordingly, the district court concluded that the net loss to the banks was $0. It said, "[I]t's obvious that what was charged in this case as criminal conduct was $900,000, and that all of it, every cent, was paid off prior to the initiation of any criminal proceeding." Moreover, the district court determined that Bennett had accepted responsibility for his conduct. In light of these findings, the district court calculated Bennett's Total Offense Level to be 8. According to the Government, the district court's computations were as follows:

| | |
|---|---|
| § 2F1.1 (base offense level) | 6 |
| § 2F1.1(b)(1) (zero loss) | 0 |
| § 2F1.1(b)(2) (minimal planning) | 2 |
| § 3B1.3 (abuse of position of trust) | 2 |
| § 3E1.1 (acceptance of responsibility) | −2 |
| TOTAL OFFENSE LEVEL | 8 |

Based on this Total Offense Level and Bennett's Criminal History Category (I), the district court concluded that the sentencing range was 2 to 8 months imprisonment, with

---

court should make the necessary correction on remand.

**6.** On appeal, the Government maintains that the total amount of charged and uncharged transactions amounts to $1,791,000 as opposed to $1,916,000. *See* chart, *supra*. The Government explains that, at sentencing, the $1,916,000 figure included a $236,000 loss on the "Kallan" loan (Loan I). On further reflection, however, the Government concedes that only $111,000 of this loan can be shown to have been funded with bank money.

**7.** The exact value of the settlement agreement is not entirely clear. The presentence report pegged the value at $694,707.15. The district court said the value was "at least $660,000."

24 to 36 months supervised release, and that the fine range was $5,000 to $50,000. Nevertheless, the district court sentenced Bennett to 24 months probation with 6 months home detention. He was also directed to pay $450 in special assessments. No fines were imposed.

## II.

The Government argues that the following three errors were committed during sentencing: the district court improperly (1) calculated loss under U.S.S.G. § 2F1.1(b)(1), (2) granted Bennett a downward adjustment in his offense level for accepting responsibility pursuant to U.S.S.G. § 3E1.1, and (3) used the November 1, 1988, Guidelines Manual. We turn to each of these arguments.

### A. *The District Court's Loss Calculation*

#### 1. *Relevant Conduct*

■ The Government argues that the district court erred in calculating the banks' losses by refusing to consider any loans except the ones for which Bennett was charged. According to the Government, U.S.S.G. § 1B1.3 requires sentencing courts to consider relevant conduct, even if such conduct does not fall within any count of conviction. The district court should, it says, have included in the loss calculation the other loans for which Bennett was not indicted. Bennett replies that the district court determined that evidence of the uncharged loans was too meager to amount to relevant conduct under U.S.S.G. § 1B1.3.

To resolve these arguments, we need to decide whether the district court determined, *as a matter of law*, that, in calculating the loss, it would disregard loans that were not alleged in the indictment, or whether it determined, *as a matter of fact*, that the Government had failed to establish, by a preponderance of the evidence, the existence of relevant non-indicted loans.[8] With regard to the former,

"[t]he legal determination as to the proper interplay among related guidelines is subject to plenary review." *United States v. Schultz*, 970 F.2d 960, 962 (1st Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1020, 122 L.Ed.2d 167 (1993). Therefore, we review de novo the district court's application of the relevant conduct guideline, U.S.S.G. § 1B1.3, to the [fraud or deceit] guideline, U.S.S.G. § [2F1.1].

*United States v. Carrozza*, 4 F.3d 70, 74 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1644, 128 L.Ed.2d 365 (1994). Regarding the latter, "[a]bsent a mistake of law, we review 'relevant conduct' findings for clear error." *United States v. Williams*, 10 F.3d 910, 913 (1st Cir.1993) (citing *United States v. Wood*, 924 F.2d 399, 403 (1st Cir.1991)).

The transcript of Bennett's two-day sentencing hearing strongly indicates that the district court determined, as a matter of law, that it would not consider, in establishing the loss to the banks, loans that were not alleged in the indictment. At the very beginning of the sentencing hearing, the district court asked:

> And how much money was obtained, according to the counts? Because my understanding is that the determination of how much time the guidelines call for, is it determined on the amount charged in the counts?

A short time later, the district court engaged in the following colloquy with the Government:

> MR. STIMSON: You have to live with the guidelines, your Honor.
>
> THE COURT: I understand you have to look at the guidelines, but I'll tell you, when you start getting into relevant conduct that is not charged, that goes against my sense of justice. I don't mind sentencing somebody on something that he's been charged with. When you're trying to get [$]800,000 more on something he's not charged with, there is something that is unjust about it. . . .

---

**8.** In *United States v. Williams*, 10 F.3d 910 (1st Cir.1993), we said, "Only after the government has met its burden of establishing, by a preponderance of the evidence, 'a *sufficient nexus* between the [extraneous] conduct and the offense of conviction,' may the sentencing court, in its sound discretion, make a 'relevant conduct' adjustment." *Id.* at 913 (quoting *United States v. Sklar*, 920 F.2d 107, 110 (1st Cir.1990)) (emphasis added in *Williams* ).

MR. STIMSON: Your Honor, the government's position is based upon the total amount of each loan.

Now, we can put[ ] aside for a moment the issue of whether we're talking just about the loans that were described in the indictment or about the other loans.

THE COURT: I want to go with those charged in the indictment.

MR. STIMSON: Okay.

THE COURT: Because if you're asking for any more time than that, it's going to be tried. I'm not sentencing anybody on time [sic] that he's not been tried on. I'm not going to. So stick with the [$]900,000 as charged or anything else that you say is charged within the nine counts.

Towards the end of the first day of the sentencing hearing, the district court stated the manner in which it was inclined to calculate the net loss to the banks:

I'll tell you [w]hat, have we all got the issue, and I want it on the record. [T]he issue is this: The $900,000 charged less money paid back to the victim bank in whatever form prior to the initiation of criminal action ... is what I am going to determine as the law.[9]

The district court further said that it was "willing to disregard the relevant conduct."

During the second day of the sentencing hearing, the district court once again visited the issue of relevant conduct. In this regard, it made the following observations and findings:

I can see that maybe a significant portion, if not all of the charged loans, ha[s] been paid. However, we have this concept of related conduct. It's obvious that, although he's paid off over $900,000 and maybe close to [$1,200,000], he hasn't paid off all the related loans. So if I do not

take those into consideration, then you may have a short-lived victory, because the upper [c]ourt, I am absolutely confident, [is] going to require them to be taken into consideration.

\* \* \* \* \* \*

On the other hand, there is some relevant conduct resulting in debts in excess of $900,000, which under the current interpretation of the guidelines has to be considered.

When the so-called relevant conduct is considered, that is matters not charged, there is a debt owing. It's very difficult to determine what that precise amount is, but it's my judgment, based on all the evidence in the case, that it's somewhere between [$100,000] and $200,000.

So I'm in a position, were I to sentence strictly with respect to charged conduct, the loss I would find is nothing. If I am to sentence him on the basis of charged conduct and related activity, the loss is between [$100,000] and $200,000.

Notwithstanding its conclusion that there was relevant conduct and that the net loss to the banks, if the relevant conduct were considered, was between $100,000 and $200,000, the district court sentenced Bennett only on the basis of the loans for which he was charged, finding a net loss to the banks of $0. It explained:

Here is what I'm going to have to do, have it set up for a new trial.

In some types of cases relevant conduct is appropriate. Loss under the cases is not just mathematical, it's intended loss. My judgment, based on hearing this case, and the amount of money that's been paid back by this defendant, [is] that it was always his intention to [re]pay the money.

9. The parties dispute whether the last word of this statement was "law" or "loss." On June 3, 1994, counsel for Bennett filed an affidavit of Patricia A. Casey–Price, the official court reporter at Bennett's sentencing hearing. Attached to the affidavit were revised pages of the sentencing hearing transcript, indicating that the court had said "loss" not "law." Subsequent to oral argument, however, the Government submitted a supplemental affidavit of Patricia A. Casey–Price, dated June 9, 1994. In it she said, "Based upon

a careful review of my stenographic notes, ... I have concluded that ... I in fact recorded the word 'law,' not the word 'loss.'"

The parties did not follow the correct procedure for correcting the record. *See* Fed.R.App.P. 10(e) (describing the correct procedure for correcting or modifying the record). But the difference between "law" and "loss" is of little consequence. In either event, the district court was setting forth the legal framework in which it was inclined to calculate the net loss.

*That being so, there is no evidence in this record, in the trial or in anything that's happened subsequent thereto, that's going to allow me, in determining the [e]lusive concept of cause,[10] to take into consideration loans which were not subject to any criminal charge[;] nor has anyone said that they were false in any way.*

So the first decision I'm making is that I'm concerned with loss resulting from criminal conduct, because that's all that's really relevant to the sentencing of this individual. That being so, it's obvious that what was charged in this case as criminal conduct was $900,000, and that all of it, every cent, was paid off prior to the initiation of any criminal proceeding.

(emphasis and footnote added).

In light of the court's comments, we see little merit in Bennett's insistence that the district court found, as a matter of fact, that the Government did not establish by a preponderance of the evidence that the uncharged loans amounted to relevant conduct. Rather the court's message was that, no matter what the evidence, it was not going to "take into consideration loans which were not subject to any criminal charge[s]." Any possible doubt as to this interpretation is removed by the court's finding that there was relevant conduct, which, if considered, would result in a net loss to the banks of between $100,000 and $200,000. Because the court thought it unfair to consider relevant conduct here, it sentenced Bennett only on the basis of the loans for which he was charged and convicted, concluding that the net loss to the banks from these was $0, and disregarding the losses on other loans.

■ A sentencing court may not, however, simply disregard relevant conduct. *E.g.,*

*United States v. Restrepo,* 946 F.2d 654, 655 (9th Cir.1991) (accepting defendant's argument that the Sentencing Guidelines severely reduce the district court's sentencing discretion and require the court to consider the sentencing effect of uncharged crimes), *cert. denied,* —— U.S. ——, 112 S.Ct. 1564, 118 L.Ed.2d 211 (1992); Lauren Greenwald, *Relevant Conduct and the Impact of the Preponderance Standard of Proof Under the Federal Sentencing Guidelines: A Denial of Due Process,* 18 Vt.L.Rev. 529, 530 (1994) ("The guidelines altered the effect that these aggravating factors had on sentencing by changing the judge's consideration of relevant conduct from discretionary to mandatory."); *see United States v. Schaper,* 903 F.2d 891, 897–98 (2d Cir.1990) (finding error in the district court's refusal to consider amounts of narcotics that were not charged in the indictment because "[t]he Sentencing Guidelines clearly provide ... that a sentencing court must consider a defendant's involvement with quantities of narcotics not charged in the count(s) of conviction when such conduct was undertaken in the same course of conduct as the offense of conviction"). Accordingly, we vacate the sentence and remand for resentencing. On remand, the district court shall include in the loss calculation the dollar amount of any and all uncharged loans that constitute relevant conduct.

### 2. *Deductions from the Loss*

■ In calculating the loss to the banks, the district court credited Bennett with, *inter alia,* the estimated value of his February 1, 1991, settlement of the civil suit brought against him by Plymouth Federal and Daniel Webster. The Government assigns error, citing U.S.S.G. § 2F1.1, comment. (n. 7(b)) (Nov. 1, 1993):[11]

As we described, *see supra* note 9, the parties have not followed the proper procedure for correcting the transcript. *See* Fed.R.App.P. 10(e). In any event, we see nothing to be gained by asking the district court to clarify the record. Our decision is not influenced by whether Judge Harrington said "cause" or "loss."

**10.** The parties dispute whether Judge Harrington said "cause" or "loss." On June 3, 1994, counsel for the defendant submitted the affidavit of Patricia A. Casey–Price, the court stenographer, in which she indicated that Judge Harrington had said "loss." However, in a June 9, 1994, supplemental affidavit, filed by the Government, Ms. Casey–Price said, "[After] listening to the magnetic audiotape of the May 19, 1993[,] proceedings, I have confirmed that, on May 19, 1993, Judge Harrington in fact used the word 'cause,' not the word 'loss.'"

**11.** Application Note 7(b), in its present form, took effect on November 1, 1992. Hence, it was not in the Guidelines Manual used by the district court. Nevertheless, it is appropriate to consider Note 7(b) because it represents a clarification,

> In fraudulent loan application cases and contract procurement cases, the loss is the *actual loss to the victim* (or if the loss has not yet come about, the expected loss). *For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan.* However, where the intended loss is greater than the actual loss, the intended loss is to be used.

(emphasis added). The Government contends that, in light of Note 7(b), the district court, in calculating the actual loss to the banks, could not credit Bennett with amounts repaid after May 3, 1990, the date his offense was discovered. Bennett counters that the district court properly considered the amount of his settlement—which came ten months before he was indicted—in calculating the banks' actual loss. Bennett cites *United States v. Gallegos,* 975 F.2d 710 (10th Cir. 1992), in which the Tenth Circuit said that a settlement agreement entered into between the defendant and the victim bank after the offense was discovered could "be viewed as an offset." *Id.* at 712–13.

[redacted] Notwithstanding the Tenth Circuit's decision, Application Note 7(b) is binding on the federal courts.[12] *Stinson v. United States,* — U.S. —, —, 113 S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993) ("[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."). The parties agree that Application Note 7(b) applies to "fraudulent loan application cases and contract procurement cases...." Note 7(b) instructs how to calculate the actual loss in cases where "a defendant fraudulently obtains a loan by misrepresenting the value of his assets." Here, Bennett fraudulently obtained line-of-credit advances by, among other things, misrepresenting the existence—and, *a fortiori,* the value—of residential mortgages. Accordingly, as Note 7(b) goes on to describe, "[T]he loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan." Because the parties agree that the full extent of Bennett's borrowing activity (*i.e.,* his offenses) was discovered on May 3, 1990, the district court erred in giving Bennett credit for payments made after that date. It should have calculated the "actual loss" to the victim banks as follows:

1. The amount of the illegal loans (*i.e.,* those for which Bennett was convicted),

plus

2. the amount of the loans constituting relevant conduct,

less

3. the amount of the loans in 1 and 2 that Bennett had repaid as of May 3, 1990,

less

4. the amount the victim banks have recovered (or can expect to recover) from any assets pledged to secure the loans in 1 and 2.

This is the framework adopted by other courts of appeals that have construed Application Note 7(b). *E.g., United States v. Jindra,* 7 F.3d 113, 114 (8th Cir.1993) (holding that, in light of Application Note 7(b), the loss was the amount of the loans outstanding when the offense was discovered because the defendant did not pledge assets to secure the loans), *cert. denied,* — U.S. —, 114 S.Ct. 888, 127 L.Ed.2d 82 (1994); *United States v. Menichino,* 989 F.2d 438, 441 (11th Cir.1993) ("[I]n a loan application case involving misrepresentation of assets, the loss is the amount of the loan not repaid at the time the

not a substantive change, of the Sentencing Guidelines. *See* U.S.S.G.App. C, amend. 470; U.S.S.G. § 1B1.11(b)(2) ("[I]f a court applies an earlier edition of the Guidelines Manual, the court shall consider subsequent amendments, to the extent that such amendments are clarifying rather than substantive changes.").

12. The Tenth Circuit cited Application Note 7(b), but did not discuss it.

offense is discovered, reduced by the amount the lender could recover from collateral.").

### B. Downward Adjustment for Acceptance of Responsibility

■ The Government contends that the district court erred in granting Bennett a two-level downward adjustment in his offense level pursuant to U.S.S.G. § 3E1.1 because there is nothing in the record to support its conclusion that Bennett accepted responsibility for his criminal conduct.[13] It insists that, from the time Bennett's crime was discovered and through his sentencing hearing, Bennett never conceded that he had engaged in bank fraud or expressed any remorse or contrition for his conduct. Furthermore, the Government submits that Bennett's settlement with Plymouth Federal and Daniel Webster was not a *"voluntary* payment of restitution," U.S.S.G. § 3E1.1, comment. (n. 1(c)) (Nov. 1, 1993) (emphasis added), that would entitle Bennett to a downward adjustment in his offense level. Bennett responds that the district court's decision was justified by his settlement offer and eventual settlement with Plymouth Federal and Daniel Webster prior to conviction, and by his demonstration of contrition and remorse at the sentencing hearing. We cannot agree.

■ Although a district court's conclusion that a defendant has accepted responsibility "is entitled to great deference on review[,]" U.S.S.G. § 3E1.1, comment. (n. 5) (Nov. 1, 1993); *e.g., United States v. Royer,* 895 F.2d 28, 29 (1st Cir.1990) (describing "clearly erroneous" standard of review), there must be some articulable basis or foundation for it, *e.g., United States v. Amos,* 952 F.2d 992, 995 (8th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1774, 118 L.Ed.2d 432 (1992). We find no such basis for the district court's decision.

■ To begin with, U.S.S.G. § 3E1.1 "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." [14] U.S.S.G. § 3E1.1, comment. (n. 2) (Nov. 1, 1993) (footnote not in original). Bennett pleaded not guilty to all nine counts and denied "the essential factual elements of [his] guilt." During his opening statement, Bennett's counsel asserted and suggested, among other things, that (1) there was nothing "out of the ordinary" about Bennett's loans, (2) the lending banks were adequately secured, (3) the slumping real estate market, not Bennett's conduct, caused Plymouth Federal's losses, and (4) Bennett never had any intent to defraud the banks. Bennett's counsel reiterated this last point at the very end of his closing argument when he said, "And I suggest no intent to defraud has been shown beyond a reasonable doubt on this evidence."

After he was convicted, Bennett apologized to his family and said that he accepted the verdict, but steadfastly maintained that he

---

13. Apparently, the district court adopted the presentence report's recommendation when it awarded Bennett a two-point reduction for acceptance of responsibility. That report, as amended on November 1, 1992, said, *inter alia:*

> On 2/1/91, prior to Bennett's indictment on the instant offense, he entered into a settlement agreement with the Plymouth Federal Savings Bank in which a portion of restitution was paid by the defendant. The payment of restitution suggests that the defendant has accepted responsibility for his actions. Per [U.S.S.G. § 3E1.1, comment. (n. 1(c)) (Nov. 1, 1993)], in determining whether a defendant qualifies for the acceptance of responsibility reduction, appropriate considerations include voluntary payment of restitution prior to adjudication of guilt. Considering the fact that restitution was paid prior to the guilty verdict in the instant matter, Bennett will be granted a two-level reduction for acceptance of responsibility.

14. This version of Application Note 2 became effective on November 1, 1990. Hence, it was not included in the November 1, 1988, Guidelines Manual used by the district court. Application Note 2 in that manual read:

> Conviction by trial does not preclude a defendant from consideration under this section. A defendant may manifest sincere contrition even if he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.,* to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).

*See* U.S.S.G.App. C, amend. 351. As we described, *see supra* note 11, it is appropriate to consider the current Application Note 2 because it constitutes a clarifying, rather than a substantive, change. *See* U.S.S.G. § 1B1.11(b)(2).

had never intended to defraud the banks. At the close of the sentencing hearing, Bennett told the district court:

I just want to say ... how sorry I am to have been the force behind the series of events that led to this trial in February, to the sentencing hearing here in a criminal case. That I've put a terrible burden on my wife and my children and my mother and sisters and the rest of my family who has supported me through it. *I never intended to ... defraud anybody.* I never intended to harm anybody.

*I'm not here to fight the verdict, I accept the verdict.* I had simply intended to try to build a couple of houses, and at a time when it looked like a good thing to do[—]one to live in and one to sell to make it an affordable project. And when I, after having discussed with the bank over a period of six months for construction financing for that project, and eventually being turned down, or at least they failed to make the loan to me, I responded poorly to it in the way that I financed it.

(emphasis added). Even assuming the above was meant to express remorse or contrition, Application Note 2 expressly says that U.S.S.G. § 3E1.1 is *not* intended to apply to a defendant who challenges essential factual elements of guilt, is convicted, and *only then* admits guilt and expresses remorse.

This is not to say that by going to trial a defendant necessarily loses his opportunity for a downward adjustment under U.S.S.G. § 3E1.1. Application Note 2 goes on to state:

Conviction by trial ... does not automatically preclude a defendant from consideration for such a reduction. In *rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct* even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.,* to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will

be based primarily upon pre-trial statements and conduct.

U.S.S.G. § 3E1.1, comment. (n. 2) (emphasis added). The downward adjustment this commentary allows is reserved for "rare situations" where a defendant who exercises his right to trial may "clearly demonstrate" an acceptance of responsibility for his criminal conduct. An example of such a situation, described in Application Note 2, occurs "where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt." This case does not fit within that example. Bennett, it is true, made the somewhat unattractive legal argument that 18 U.S.C. § 1344 did not apply to his conduct as any fraud allegedly committed by him was a fraud upon the Daniel Webster Mortgage Company, which was not a financial institution under the statute. But he denied his factual guilt also. At closing, Bennett's counsel argued:

Now the key position of the defense in this case is that the vital element of these charges, that the defendant must be proved to have intentionally, with criminal specific intent, attempted or intended to defraud the banks. That's the key that I'm going to suggest to you by a review of the evidence and in particular several of the exhibits, that's the key where the government has failed and that consequently the defendant is entitled to an acquittal.

■ There are other "rare situations," not described in Note 2, in which courts have allowed a downward adjustment even though a defendant puts the Government to its burden of proof at trial by denying the essential factual elements of his guilt. *E.g., United States v. McKinney,* 15 F.3d 849, 852–55 (9th Cir.1994) (holding "that, in appropriate circumstances[,] the reduction is also available in cases in which the defendant manifests genuine contrition for his acts but nonetheless contests his factual guilt at trial[ ]"). Where a defendant exercises his right to trial, however, a determination that he has clearly demonstrated acceptance of responsibility for his criminal conduct "will be based primarily upon pre-trial statements and conduct." U.S.S.G. § 3E1.1, comment. (n. 2). The issue then is whether Bennett, by set-

tling the lawsuit brought by Plymouth Federal and Daniel Webster before trial, clearly showed that he had accepted responsibility for his illegal activities. We think not.

■ Settling a pending lawsuit scarcely demonstrates contrition. Nor does it indicate a "willingness to adhere to political society's laws." *United States v. Bean*, 18 F.3d 1367, 1369 (7th Cir.1994). In *Bean*, the defendant, Bill Gene Bean, kited checks, totaling $75,000, "to cover a cash-flow shortage in his recycling business." *Id.* at 1368. Bean was charged with committing bank fraud in violation of 18 U.S.C. § 1344. Over a period of two years before trial, Bean repaid the $75,000. He then went to trial, denying that he had intended to defraud a bank, and was convicted by a jury as charged. In these circumstances, the Seventh Circuit observed:

> The Sentencing Guidelines permit a judge to reduce the sentence for repayment whether or not the defendant pleads guilty to the charge. Application Note 1(c) to § 3E1.1 lists "voluntary payment of restitution prior to adjudication of guilt" as an independent reason for a two-level acceptance-of-responsibility reduction. Bean repaid the bank before the adjudication of guilt, and the district court therefore was entitled to award a reduction for acceptance of responsibility even though Bean denied guilt.

*Bean*, 18 F.3d at 1368.

Unlike Bean, Bennett paid restitution here as part of the settlement of a civil lawsuit.[15] We agree with the Government that Bennett's payment by way of settlement was not a "*voluntary* payment of restitution prior to

adjudication of guilt," U.S.S.G. § 3E1.1, comment. (n. 1(c)), that justifies a reduction for acceptance of responsibility. Under U.S.S.G. § 3E1.1, the downward adjustment "must be consistent with the attitude the Commission took toward restitution, which is that restitution is relevant to the extent it shows acceptance of responsibility." *United States v. Miller*, 991 F.2d 552, 553 (9th Cir.1993). Accordingly, "*the payment [must] have been genuinely voluntary, rather than motivated primarily by a collateral consideration such as a desire to settle the civil lawsuit [brought] by the bank[s].*" *Id.* (emphasis added).

We hold that the district court's decision to grant Bennett a two-level reduction for acceptance of responsibility was clearly erroneous.[16]

### C. Use of the November 1, 1988, Guidelines Manual

■ Effective November 1, 1989, the loss table in U.S.S.G. § 2F1.1(b)(1) was amended. Among other things, the amendment "increase[d] the offense levels for offenses with larger losses to provide additional deterrence and better reflect the seriousness of the conduct." U.S.S.G. App. C, amend. 154. All of the line-of-credit advances that corresponded with the nine counts of conviction were obtained prior to the November 1, 1989, amendment to the loss table. Consequently, when Bennett was sentenced in May 1993, there was an issue as to whether using the version of the Guidelines Manual then in effect (*i.e.*, the November 1, 1992, edition)—which included the amended loss table—would violate

---

15. Bennett indicates that a settlement offer he made to Daniel Webster and Plymouth Federal in May 1990, before they filed their civil suit, was rejected. Even if we accept this assertion at face value, for purposes of acceptance of responsibility under the Sentencing Guidelines, an offer to pay restitution is not the same as actually paying it. *See* U.S.S.G. § 3E1.1, comment. (n. 1(c)) (Nov. 1, 1993) ("voluntary *payment* of restitution prior to adjudication of guilt").

16. Having stressed that post-trial acceptance of responsibility is the exception and must normally be borne out by pre-trial actions, we nevertheless do not intend to establish any blanket rule; the guideline's own application note leaves open the possibility of exceptions. But we do think that

unless some obvious basis is apparent from the record, it may be difficult to uphold a reduction in cases where the defendant went to trial, asserted his or her innocence, and has nothing substantial in the way of pre-trial conduct to show earlier acceptance of responsibility—*unless* the district court is able to point to some persuasive reason for this determination. Thus, even where there may ordinarily be no special requirement for a statement of reasons in making sentence determinations, cases like this one may present situations in which an explanation by the district court is as a practical matter essential to establish that the guideline's rather stringent standards for post-trial conversions have been satisfied.

the Ex Post Facto Clause of the United States Constitution. U.S. Const. art. I, § 9, cl. 3; *see United States v. Havener*, 905 F.2d 3, 5 (1st Cir.1990) ("[T]he Constitution's [E]x [P]ost [F]acto [C]lause forbids the application of any law or rule that *increases* punishment to preexisting criminal conduct." (emphasis in original)). With this concern in mind, the district court, pursuant to U.S.S.G. § 1B1.11 [17] and the presentence report's recommendation, employed the November 1, 1988, version of the Guidelines Manual.

The Government complains of this decision. It contends that using the November 1, 1992, Guidelines Manual would not violate the Ex Post Facto Clause. According to the Government, where a defendant engages in a series of offenses comprising separate executions of a single scheme or plan, and that scheme "straddles" the old law and the new law, applying the new law does not violate the Constitution. The Government maintains that each of the nine counts against Bennett was a separate execution of a common scheme to defraud the banks. It points out that certain activities ancillary to one of the fraudulently induced loans, namely, the loan of May 12, 1989, charged in Count 7, actually occurred as late as April 1990. At this time, in an attempt to conceal his borrowing activities, Bennett provided FDIC examiners and Plymouth Federal employees with a doctored mortgage and assignment that bore forged recording stamps. Because of that conduct, the Government would have us view the entire scheme to defraud, as reflected in all nine counts, as continuing until at least April 1990, several months after the November 1, 1989, amendment to the loss table. We are not persuaded.

 In rejecting the Government's argument, we are guided by U.S.S.G. § 1B1.11, comment. (n. 2) (Nov. 1, 1993), which states:

Under subsection (b)(1), the last date of the offense of conviction is the controlling date for *ex post facto* purposes. For ex-

ample, if the offense of conviction (*i.e.*, the conduct charged in the count of the indictment or information of which the defendant was convicted) was determined by the court to have been committed between October 15, 1991[,] and October 28, 1991, the date of October 28, 1991[,] is the controlling date for *ex post facto* purposes. *This is true even if the defendant's conduct relevant to the determination of the guideline range under § 1B1.3 (Relevant Conduct) included an act that occurred on November 2, 1991 (after a revised Guideline[s] Manual took effect).*

(emphasis added). This Application Note requires district courts to determine the last date of the offense of conviction. In so doing, they must necessarily distinguish "the conduct charged in the count of the indictment ... of which the defendant was convicted" from relevant conduct, which is immaterial for *ex post facto* purposes, *see* U.S.S.G. § 1B1.11, comment. (n. 2).

The probation officer who prepared the presentence report found that "the counts of conviction terminated on 10/2/89." She further concluded that Bennett's April 1990 acts of concealment, while relevant conduct, were not the conduct charged in Count 7 of which Bennett was convicted. The district court adopted these findings, which we think are sound.

The indictment charged Bennett with nine counts of bank fraud in violation of 18 U.S.C. § 1344. Each count corresponded with a different line-of-credit advance—the first on August 11, 1988, and the last on October 2, 1989. The allegations in Count 7, which corresponded with the May 12, 1989, loan, were virtually identical to those of the other counts. The only difference was that Count 7 did not allege that Bennett had made false statements about the identity of the borrow-

---

**17.** U.S.S.G. § 1B1.11 (Nov. 1, 1993) states in relevant part:

(a) The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced.

(b)(1) If the court determines that use of the Guidelines Manual in effect on the date that

the defendant is sentenced would violate the *ex post facto* clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed.

er,[18] and it included a paragraph, not found in the other counts, which stated:

> Created and caused to be created forms of mortgage and assignment of mortgage for Loan G, which documents indicated that they had been duly recorded in the Registry of Deeds for the County of Plymouth, when in fact, as the defendant then well knew, such documents had not been recorded; and the defendant placed and caused to be placed such false and fraudulent documents in the lender loan file for Loan G, where such documents had the capacity to influence Plymouth [Federal].

The Government argues that the above conduct, occurring in April 1990, lengthens the last date of the offense of conviction until then. Our problem with this argument is that the Government itself, in the prefatory section of the indictment, alleged merely that defendant's obtaining of illegal loans extended from August 1988 until October 1989. In determining "the last date of the offense of conviction" for *ex post facto* purposes and the Application Note, it is only reasonable to hold the Government to its own alleged dates. Count 7 alleged that Bennett knowingly executed, and knowingly attempted to execute, a scheme and artifice to defraud Plymouth Federal "in connection with a loan granted on or about *May 12, 1989.*" This was the focus of the illegal activity charged in Count 7. While the deceptive activities in April 1990 were unquestionably related to the charged fraud, and fit well into the definition of "relevant conduct" set out in U.S.S.G. § 1B1.3, the date of relevant conduct is not controlling for *ex post facto* purposes. We accept the probation officer's view, impliedly adopted as a finding by the district court, that Bennett's April 1990 chicanery was relevant conduct, rather than an integral part of the offense of conviction itself, the last date of the latter having been October 2, 1989. We find no error in the district court's decision to use the November 1, 1988, Guidelines Manual.

In this regard, the Government's reliance on *United States v. Regan,* 989 F.2d 44 (1st Cir.1993), is misplaced. There, the defendant was charged with having committed 55 counts of embezzlement in violation of 18 U.S.C. § 656 (1988). The conduct in the indictment of which the defendant was convicted was expressly alleged to have run from November 1987 to July 16, 1991. Thus, some of the acts of embezzlement charged in the indictment occurred after the November 1, 1989, amendment to the relevant loss table in U.S.S.G. § 2B1.1(b)(1). Here, by contrast, the last alleged date of the offense of conviction was October 2, 1989—prior to the November 1, 1989, amendment to the loss table in U.S.S.G. § 2F1.1(b)(1).

### III.

Because the district court improperly calculated the loss to the banks, and erroneously granted Bennett a downward adjustment in his offense level for acceptance of responsibility, we vacate the district court's sentencing decision and remand for resentencing consistent with this opinion. The district court's decision to use the November 1, 1988, Guidelines Manual is affirmed.

*So ordered.*

---

**18.** The loan that corresponded with Count 7 differed from the other charged loans in that it was the only one in which Bennett used his real name. *See* chart, *supra.*