UNITED STATES of America, Appellant,

v.

George S. BENNETT, Jr.,
Defendant, Appellee.

No. 95–1051.

United States Court of Appeals,
First Circuit.

Heard May 1, 1995.

Decided July 31, 1995.

William P. Stimson, Asst. U.S. Atty., with whom Donald K. Stern, U.S. Atty., was on brief, Boston, MA, for appellant.

Morris M. Goldings, with whom John F. Aylmer, Jr. and Mahoney, Hawkes & Goldings, were on brief, Boston, MA, for appellee.

Before SELYA, CYR and BOUDIN, Circuit Judges.

CYR, Circuit Judge.

Following our remand for resentencing in *United States v. Bennett,* 37 F.3d 687 (1st Cir.1994) ("*Bennett I*"), which vacated a downward adjustment for acceptance of responsibility, the district court determined that the defendant's restitutionary effort—an element in its initial downward *adjustment* ruling—nonetheless warranted a downward *departure* from its recalculated guideline sentencing range ("GSR"). The government

again appealed, and we now remand for resentencing within the recalculated GSR.

# I

## BACKGROUND

We relate only the facts essential to an understanding of the instant appeal. For further detail, the reader is invited to see *Bennett I*, 37 F.3d at 689–92.

### A. *Factual Background and Initial Sentencing*

Appellee Bennett abused positions of trust with Daniel Webster Mortgage Company, Inc. ("Daniel Webster"), by obtaining more than ten fraudulent real estate loans based on Daniel Webster's lines of credit with Plymouth Federal Savings Bank ("Plymouth Federal") and New Bedford Institution for Savings, which Bennett applied toward the development of real properties held in trust for the benefit of himself and his wife. The fraudulent borrowing scheme involved aliases, false loan documents and concealment. Following its discovery by the Federal Deposit Insurance Corporation during the spring of 1990, Daniel Webster and Plymouth Federal sued Bennett. On February 1, 1991, the parties entered into a settlement agreement, requiring Bennett to turn over cash and other property, including certain improved properties which remained in his possession.

In late 1991, Bennett was indicted on nine felony counts for fraudulently obtaining $900,000 from a financial institution, *see* 18 U.S.C. § 20 (1988) (defining "financial institution"), between August 1988 and October 1989. *See* 18 U.S.C. § 1344. Following his trial and conviction on all charges, the district court calculated the total loss occasioned by Bennett at $900,000, *see* U.S.S.G. § 2F1.1(b), rejecting the government's con-

tention that the total loss should include, as relevant conduct, amounts fraudulently borrowed but not charged in the indictment. The district court then deducted (1) the $589,000 Bennett had repaid on the indictment loans prior to the discovery of his crimes, and (2) the value to Daniel Webster—"at least $660,000"—of the civil suit settlement agreement entered into after Bennett's crimes had been discovered.

Having determined that no loss had been occasioned by Bennett's fraud, the district court ruled that Bennett merited a two-level downward *adjustment, see* U.S.S.G. § 3E1.1, for acceptance of responsibility by agreeing to settle the indictment loans in full. The resulting Total Offense Level ("TOL") of 8,[1] together with a Criminal History Category of I, produced a GSR of from 2 to 8 months' imprisonment, 24 to 36 months' supervised release, and a $5,000 to $50,000 fine. The district court sentenced Bennett to 24 months' probation and six months' home detention, special assessments totaling $450, and no fine.

### B. *Bennett I*

On appeal in *Bennett I* we held that the district court had erred in excluding from the total loss calculation under U.S.S.G. § 2F1.1(b)(1), as relevant conduct, the losses resulting from fraudulent borrowings not charged in the indictment, *Bennett I*, 37 F.3d at 694, and in crediting Bennett with "at least $660,000" for the civil suit settlement entered into *after* his crimes had been discovered. *Id.* at 695 (" '[T]he loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan.' ") (citing U.S.S.G. § 2F1.1, n. 7(b)).[2] Finally, *Bennett I* held that the

---

1. The TOL calculations at the first sentencing were as follows:

| | |
|---|---|
| § 2F1.1 (base offense level) | 6 |
| § 2F1.1(b)(1) (zero loss) | 0 |
| § 2F1.1(b)(2) (more than minimal planning) | 2 |
| § 3B1.3 (abuse of position of trust) | 2 |
| § 3E1.1 (acceptance of responsibility) | (2) |
| TOL | 8 |

2. *Bennett I* established the following formula for calculating "actual loss" under U.S.S.G. § 2F1.1 on remand:

1(a) the total dollar amount of the fraudulent loans involved in the nine counts of conviction ($900,000); *and*

(b) the total dollar amount of all loans coming within the "relevant conduct" guideline calculation ($526,000); *less*

two-level downward *adjustment* for acceptance of responsibility was clear error, since Bennett had neither demonstrated genuine contrition nor made *voluntary* restitution by settling the civil suit, nor pled guilty to the charges in the indictment, but instead denied the essential factual elements of the charges throughout trial and at sentencing by maintaining that he had never intended to defraud the banks. *See id.* at 696–98. We therefore vacated the first sentence and remanded for resentencing. *Id.* at 700.

## C. Resentencing

On remand the district court recalculated the total loss at $837,000, after including the losses occasioned by the fraudulent borrowings for which Bennett was not indicted, resulting in a TOL of 18.[3] Following Bennett's request for a downward *departure, see* 18 U.S.C. § 3553(b), the district court identified two factors ostensibly warranting a departure from the GSR. First, Bennett had already served a portion of the original sentence, including the entire six months' home detention term. Second, the civil suit settlement constituted "an extraordinary act that seldom occurs in the criminal courts . . . ." Accordingly, the district court granted a six-month downward departure from the recalculated 27–month GSR minimum, based on the six months' home detention term already served, combined with a further 15–month downward departure for the "extraordinary act" of entering into the civil suit settlement agreement to repay $694,000.[4] The district court then imposed the minimum six-month prison term now under challenge on appeal.

2(a) the total dollar amount of all loans *repaid* by the defendant prior to May 3, 1990 ($589,000), the date Bennett's unlawful activities were discovered; *and*
(b) the total recoveries realized and reasonably to be expected from all collateral pledged to secure the fraudulent loans involved in all counts of conviction and encompassed within the relevant conduct calculation.
*See Bennett I,* 37 F.3d at 695.

3. The recalculated TOL is comprised as follows:
§ 2F1.1(a) (base offense level) 6
§ 2F1.1(b)(1) (total loss of $837,000) 8
§ 2F1.1(b)(2) (more than minimal planning) 2
§ 3B1.3 (abuse of position of trust) 2
TOL 18

## II

## DISCUSSION

The United States contends that *Bennett I* foreclosed both a downward adjustment and a downward departure for acceptance of responsibility based on the civil settlement and Bennett's belated expression of contrition at sentencing. *See Bennett I,* 37 F.3d at 696–98; *see also* U.S.S.G. § 3E1.1 (permitting two-level downward *adjustment* for clear demonstration of acceptance of responsibility).

## A. Downward Departure

A sentencing court may *depart* from the GSR "only in the extraordinary case—the case that falls outside the heartland for the offense of conviction. . . ." *United States v. Jackson,* 30 F.3d 199, 201 (1st Cir.1994); *see also United States v. Rivera,* 994 F.2d 942, 947–49 (1st Cir.1993). The departure decision is subject to bifurcated review. *United States v. Fahm,* 13 F.3d 447, 450 (1st Cir.1994). First, all "quintessentially legal" rulings underlying the decision to depart (viz., whether the guideline language encourages, permits or forbids departure for the *kinds of reasons* relied upon by the sentencing court) are reviewed de novo. *Id.* at 450 (quoting *Rivera,* 994 F.2d at 951). Second, the "heartland" determination itself is reviewed with "full awareness of, and respect for, the trier's superior 'feel' for the case." *Rivera,* 994 F.2d at 952 (citation omitted); *see also Fahm,* 13 F.3d at 450.

4. As the government has not appealed the six-month downward departure, we do not address it. *But cf. United States v. Zackular,* 945 F.2d 423, 425 (1st Cir.1991) (rejecting home confinement as "official detention" for purposes of 18 U.S.C. § 3585 (Credit for Prior Custody): "While a defendant's movement may be severely curtailed by . . . home confinement, . . . confinement to the comfort of one's own home is not the functional equivalent of incarceration in either a practical or a psychological sense."); *see also Reno v. Koray,* —— U.S. ——, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (construing phrase "official detention," *see* 18 U.S.C. § 3585(b), in light of Bail Reform Act of 1984, related sentencing provisions and Bureau of Prisons guidelines).

### 1. *Extraordinary Act*

 Following *Bennett I*, the district court found that the $660,000 settlement agreement constituted "an extraordinary act that seldom occurs in the criminal courts," for which Bennett "should be rewarded...." The district court carefully avoided explicit reliance on "acceptance of responsibility," apparently in deference to *Bennett I*, 37 F.3d at 698 (stressing that restitution must be " 'genuinely voluntary, rather than motivated primarily by a collateral consideration such as a desire to settle the civil lawsuit' ") (quoting *United States v. Miller*, 991 F.2d 552, 553 (9th Cir.1993)); *cf. United States v. Hendrickson*, 22 F.3d 170, 176 (7th Cir.) (rejecting civil forfeiture, in light of its involuntary nature, as basis for finding of "extraordinary acceptance of responsibility"), *cert. denied*, —— U.S. ——, 115 S.Ct. 209, 130 L.Ed.2d 138 (1994). *Bennett I* also held, however, that the civil suit settlement was not "genuinely voluntary," 37 F.3d at 698, and that " 'restitution is relevant *to the extent it shows acceptance of responsibility.*' " *Id.* (quoting *Miller*, 991 F.2d at 553) (emphasis added). Consequently, whether or not the civil suit settlement constituted an "extraordinary act," there has been no showing that it formed a material basis for either a downward adjustment or a downward departure, let alone for establishing restitutionary conduct outside the "heartland." *See Rivera*, 994 F.2d at 947.

As the only ground for the challenged downward departure had been foreclosed by *Bennett I*, which plainly held that the civil suit settlement was not genuinely "voluntary" within the meaning of U.S.S.G. § 3E1.1, *see Bennett I*, 37 F.3d at 698, and could not form the basis for a downward *adjustment* for acceptance of responsibility, it could afford no permissible basis for the 15–month downward *departure*. *See Miller*, 991 F.2d at 553 (sentencing court may depart downward on basis of restitutionary conduct only if it evinces an acceptance of responsibility substantially greater than that required for a downward *adjustment* under U.S.S.G. § 3E1.1).

### 2. *Overstated Loss and "Multiple Loss Causation"*

 On appeal, Bennett broaches for the first time the alternative arguments that the 15–month downward departure should be upheld either because the $837,000 total loss recalculation significantly overstates the seriousness of his conduct, *see* U.S.S.G. § 2F1.1, n. 7(b) (1994), or on the ground of multiple loss causation. *See, e.g., United States v. Rostoff*, 53 F.3d 398, 405 (1st Cir.1995) (acknowledging that a downward departure may be warranted in the "few instances" where "... a misrepresentation ... is not the sole cause of the loss....") (citing U.S.S.G. § 2F1.1, n. 11 (1987)); *see also United States v. Gregorio*, 956 F.2d 341, 345 (1st Cir.1992).

Although Bennett contends that the total loss is overstated as a consequence of an economic downturn in the regional economy, insofar as the record on appeal permits assessment it undermines Bennett's claim. The valuation of the property Bennett agreed to surrender under the terms of the civil suit settlement was disputed at the initial sentencing; viz., the government contending for $431,024.16, Bennett $684,000. At that time, Bennett maintained that a slumping economy had reduced the value of the settlement *after* the banks took title to the improved properties and other assets tendered by Bennett. The district court accordingly rejected the lower valuation propounded by the government, and found the settlement worth "at least $660,000." Subsequently, at resentencing, it placed the value of Bennett's "extraordinary act" at $694,000.

Thus, not only did Bennett not proffer record evidence of a sudden, unforeseen downturn in the regional economy that significantly lowered the value of the properties financed with his illegal borrowings, but throughout both prior sentencing proceedings he maintained that market factors had not affected these properties. We therefore hold both that the "multiple loss causation" claim has not been preserved, *see United States v. Dietz*, 950 F.2d 50, 55 (1st Cir.1991) ("[I]n connection with sentencing as in other contexts ... arguments not seasonably addressed to the trial court may not be raised for the first time in an appellate venue."),

and that it is unsupported—indeed contra-dicted—by the record.

## III

### *CONCLUSION*

As all available avenues for a downward departure have been foreclosed, we vacate the second sentence imposed by the district court and remand for resentencing within the guideline sentencing range prescribed by the total offense level recalculated by the district court at the first resentencing.

*SO ORDERED.*