USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 96-1219 UNITED STATES OF AMERICA, Appellee, v. SCOTT FRAZA, Defendant, Appellant. _____________________ No. 96-1220 UNITED STATES OF AMERICA, Appellee, v. JAMES FRAZA, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Raymond J. Pettine, Senior U.S. District Judge] __________________________ ____________________ Before Selya, Circuit Judge, _____________ Aldrich, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ ____________________ ____________________ W. Kenneth O'Donnell with whom D'Agostino & O'Donnell and Anthony ____________________ _______________________ _______ M. Traini were on brief for appellant Scott Fraza. _________ Anthony M. Traini with whom W. Kenneth O'Donnell and D'Agostino & _________________ _____________________ ____________ O'Donnell were on brief for appellant James Fraza. _________ Ira Belkin, Assistant United States Attorney, with whom Sheldon __________ _______ Whitehouse, United States Attorney, was on brief for appellee.  __________ ______________________ ____________________ February 18, 1997 ____________________ ALDRICH, Senior Circuit Judge. James Fraza and his ____________________ son Scott ("James" and "Scott," collectively "defendants") were indicted on various counts of fraud, 18 U.S.C. 2, 1041, 1341, 1344, 1346, and violations of the Taft-Hartley Act, 18 U.S.C. 371, arising from a scheme to defraud a credit union. After a four day jury trial, both defendants were found guilty on all counts and now appeal their convictions and sentences. We affirm, with a minor exception. I. Background __________ In 1989, James offered to purchase 80 acres of land in Coventry, Rhode Island, from George Dupont ("Dupont"). The agreed upon price was $120,000, financing to include Dupont holding a mortgage of $60,000. James signed a Purchase and Sale agreement and gave Dupont a $2,000 deposit check, but it required additional financing to complete the sale. In April of 1990, James met with officers of the Coventry Credit Union ("CCU"). During this meeting he told the officers that the purchase price of the property was $205,000 and that he was seeking to finance $160,000. They informed him that due to his prior bankruptcy, no such loan could be granted. James then suggested that his son Scott purchase the property and take the loan. The CCU officers agreed to consider the request, but cautioned that Scott -3- would likely require a co-signer due to his youth and short credit history. In May of 1990, James and Dupont attended an informal "closing" in the back seat of the car of Leo Dailey ("Dailey"), an attorney whose firm had represented CCU for over twenty years. Dupont signed two closing statements -- one reflecting the actual purchase price of $120,000 and the other blank. Dailey told Dupont he needed the blank form to make a correction to a tax computation. At the same time, Dupont endorsed a deed conveying the property to Scott's construction company. No money or financial instruments changed hands at this time. After two abortive attempts, James found a co-signer and CCU approved a $160,000 loan based on the inflated purchase price of $205,000. CCU's appraisal of the fair market value of the property came in at $225,000. The "formal" closing was held on June 15. Present were James, Scott, Scott's co-signer, a CCU loan officer and Dailey who was acting as CCU's attorney. Dailey explained that Dupont was unavailable and produced the signed blank closing form. He then filled in the purchase price as $205,000. After Scott signed, the loan officer disbursed $160,000 to Dailey who then paid the closing costs, the existing $58,740 mortgage on the property and gave the remaining approximately $95,000 to Scott who in turn paid -4- Dailey $5,000 for his work. A short time later Dupont received Scott's signed promissory note and mortgage in the amount of $60,000 in the mail. Dupont was not informed that CCU held a $160,000 first mortgage on the property. Within six months of the sale, Scott filed for bankruptcy. As part of bankruptcy proceedings, both defendants, represented by Dailey, gave deposition testimony that they had given CCU an inflated price for the Dupont property. At approximately the same time, Dailey's law firm mailed Dupont a tax form indicating that Dupont had received $205,000 from Scott for the property. In response to Dupont's complaints, he was provided with a corrected tax form but, along with it, he received a copy of the closing statement stating the purchase price as $205,000. Also about this time, the loan to Scott became delinquent and CCU discovered that the actual purchase price of the property was $120,000 instead of $205,000 and the existence of two different closing statements. Dailey's law firm, wanting to keep CCU as a client, arranged for its pension fund to pay CCU $160,000 and take over the mortgage. In October 1993, James, Scott and Dailey were indicted on charges of bank fraud, mail fraud, making false statements to a federally insured lending institution, aiding and abetting, and conspiracy under the Taft-Hartley Act to commit these offenses. Dailey died prior to trial. James -5- and Scott were found guilty on all counts and sentenced to 37 months and 24 months respectively. Both were also sentenced to identical terms of supervised release, joint and several restitution of $54,000 to Dupont, $200 in special assessments and reimbursement of all attorney's fees and expert witness fees paid pursuant to the Criminal Justice Act ("CJA"). II. Discussion __________ Defendants raise multiple grounds on appeal encompassing issues relating to indictment, trial and sentencing. For clarity's sake we address these issues in chronological order. A. Indictment __________ Defendants contend that Count II, knowingly making false statements to a federally insured lending institution, 18 U.S.C. 1014, and Count III, bank fraud, 18 U.S.C. 1344, are multiplicitous, thereby violating the Double Jeopardy Clause of the Fifth Amendment of the Constitution. Our analysis begins with application of the test laid out in Blockburger v. United States, 284 U.S. 299 ___________ ______________ (1932), which provides that double jeopardy is not implicated if, when comparing two offenses arising out of the same transaction, each offense "requires proof of an additional fact which the other does not." Id. at 304. This analysis ___ is sometimes referred to as the Blockburger "elements test." ___________ -6- In United States v. Norberg, 612 F.2d 1 (1st Cir. _____________ _______ 1979), we set forth the elements to be proven under 18 U.S.C. 1014. They are: (1) that the [Institution's] deposits were [federally insured]; (2) that the defendant made false statements to the [Institution]; (3) that the defendant knew the statements were false; and (4) that the statements were materially false and made for the purpose of influencing the [Institution] to make a loan or advance. Id. at 3. More recently, in United States v. Brandon, 17 ___ _____________ _______ F.3d 409 (1st Cir.), cert. denied, ___ U.S. ___, 115 S. Ct. ____________ 80 (1994), we construed the elements of bank fraud under 18 U.S.C. 1344 as: (1) engag[ing] in a scheme or artifice to defraud, or ma[king] false statements or misrepresentations to obtain money from; (2) a federally insured financial institution; and (3) d[oing] so knowingly. Id. at 424. ___ Thus, on the plain language of these statutes, the requirements of Blockburger are satisfied. Section 1014 ___________ contains an element not contained in 1344, that is, proof that the statements were "materially false." Likewise, 1344 encompasses a "scheme or artifice to defraud," which is not an element of 1014. Defendants, nonetheless, urge -7- us to adopt the opinion of a divided Second Circuit in United ______ States v. Seda, 978 F.2d 779 (2d Cir. 1992), which held that ______ ____ 1014 and 1344, when arising from the same offense, are multiplicitous. 978 F.2d at 781. We do not agree. In Seda, the court moved beyond Blockburger ____ ___________ statutory analysis, relying instead on Whalen v. United ______ ______ States, 445 U.S. 684 (1980), where the Court held that counts ______ of rape and felony murder were not separate offenses because in that case "proof of rape [was] a necessary element of proof of the felony murder." 445 U.S. at 694. We read Whalen, however, as the rule only in cases of lesser or ______ greater included offenses, see United States v. Dixon, 509 ___ _____________ _____ U.S. 688, 698 (1993), for which rape and felony murder qualify, but bank fraud and making false statements to a federally insured lending institution do not. Indeed, in Dixon, the Court overruled the "same conduct" test of Grady _____ _____ v. Corbin, id. at 711-12, and reaffirmed the mandatory ______ ___ application of Blockburger statutory analysis. Id. at 696; ___________ ___ cf. United States v. Wolfswinkel, 44 F.3d 782, 785 (9th Cir. ___ _____________ ___________ 1995) (finding Seda non-viable in the wake of Dixon). ____ _____ Although the Blockburger elements test is mechanistic and ___________ often criticized, we are already bound by it. Rossetti v. ________ Curran, 80 F.3d 1, 6 (1st Cir. 1996); United States v. Black, ______ _____________ _____ 78 F.3d 1, 4 (1st Cir.), cert. denied, ___ U.S. ___, 117 S. ____________ Ct. 254 (1996). Because it is possible to violate either -8- statute without violating the other, we believe the best view is that these two counts are not multiplicitous. B. Trial _____ First, defendants contend that as regards Count IV, Mail Fraud, there was no evidence that co-conspirator Dailey mailed, or caused to be mailed, the mortgage to Dupont. The evidence, however, shows that when Dupont received the mortgage in the mail, the return address on the envelope was that of Dailey's law firm. In addition, the jury heard evidence that Dailey acted as closing attorney in this transaction and recorded the mortgage. From this testimony a reasonable jury could infer that Dailey mailed the mortgage to Dupont. Defendants next maintain that deposition testimony given by each defendant during Scott's bankruptcy proceeding was non-admissible as former testimony under Fed. R. Evid. 804(b)(1) because neither defendant had motive or opportunity to cross-examine the other. This is a misconception. In the first place, each deposition was redacted to apply only to the deponent. Against him it was clearly admissible; anything affecting its weight could be offered separately. If the other defendant was entitled to have it limited, and not apply to him, it was his obligation to request an instruction. United States v. Barnett, 989 F.2d 546, 558 _____________ _______ n.14 (1st Cir. 1993); United States v. Mateos-Sanchez, 864 _____________ ______________ -9- F.2d 232, 238 (1st Cir. 1988); Fed. R. Evid. 105. Neither did. Defendants next object to the introduction of their deposition testimony by claiming violations of their Fifth Amendment privilege against self-incrimination. It is elementary that the privilege must be asserted at the time of the questioning. Minnesota v. Murphy, 465 U.S. 420, 429-30 _________ ______ (1984). Defendants seek to excuse themselves by blaming their failure to assert on their attorney Dailey, claiming that he failed to advise them due to his conflict of interest. We give present counsel high marks for imagination, but nothing else. The deposition inquiry was not by a government official and therefore not an abuse of defendants' Fifth Amendment rights. See Colorado v. ___ ________ Connelly, 479 U.S. 157, 170 (1986) ("The sole concern of the ________ Fifth Amendment . . . is governmental coercion."). Once the answer was given, we know of no authority suggesting that the government could not use it. C. Sentencing __________ 1. Calculation of the Loss _______________________ Defendants next challenge the court's seven level enhancement under U.S.S.G. 2F1.1(b)(1),1 based on its  ____________________ 1. U.S.S.G. 2F1.1(b)(1) provides a sliding scale requiring an increase to the offense level calculation based on the amount of the loss caused by or intended by the defendant. Losses greater than $120,000 but less than $200,000 call for a seven level increase. -10- calculation of a $124,000 loss to the victims of defendants' fraud.2 They maintain that because Dailey's pension fund "purchased" Scott's mortgage from CCU for the full $160,000, this figure should not enter into the loss calculation. This was not a purchase for value, however, but a form of laundering. We previously examined the mechanics of loss calculation as pertaining to 2F1.1 in some detail in United ______ States v. Bennett, 37 F.3d 687 (1st Cir. 1994), and again in ______ _______ United States v. Kelley, 76 F.3d 436 (1st Cir. 1996), and see _____________ ______ no need to engage in lengthy analysis here. In Bennett, we _______ concluded that Application Note 7(b) controls the methodology for calculating loss under 2F1.1(b)(1). 37 F.3d at 695. Note 7(b) provides that in the case of a fraudulent loan, "[t]he loss is the amount of the loan not repaid at the time ___________ the offense is discovered, reduced by the amount the lending __________________________ institution has recovered (or can expect to recover) from any assets pledged to secure the loan." Id. (emphasis supplied). ___ Because CCU discovered the fraud before Dailey's law firm's pension fund acquired the mortgage, the full $160,000 was correctly included in the loss calculation.  ____________________ 2. The court calculated the loss as of the time of discovery of the fraud as $160,000 for the CCU mortgage plus $60,000 for Dupont's mortgage, less $96,000, the appraised value of the property on that date. -11- Defendants also contend that the court erred in including the $60,000 Dupont mortgage in the loss calculation because the amount of the loss attributed to Dupont was speculative. We agree with the government, however, that with an appraised value of only $96,000 at the time of discovery and a first mortgage to the pension fund of $160,000, Dupont's second mortgage was worthless. -12- 2. Obstruction of Justice ______________________ Defendants next complain of the two level enhancement each received for obstruction of justice under U.S.S.G. 3C1.1. We review factual determinations of whether a defendant obstructed justice only for clear error. United States v. Thomas, 86 F.3d 263, 263 (1st Cir. 1996) _____________ ______ (citing United States v. St. Cyr, 977 F.2d 698, 705-06 (1st _____________ _______ Cir. 1992)). The record contains evidence of several independent acts by the defendants supporting these enhancements, including submitting a false affidavit by James (later admitted to be untrue), witness intimidation, albeit after the fact, and false objections to the Pre-Sentence Report. See U.S.S.G. 3C1.1, Application Notes ___ 3(a),(f),(h). Faced with multiple reasons supporting the enhancement, we cannot say that the 2 level enhancement for obstruction of justice was error, clear or otherwise. 3. Role in the Offense Determinations __________________________________ James contests his two level enhancement for being a manager or organizer of the criminal activity, seeking instead to award that role to Dailey. We can dispose of this contention forthwith. Reviewing again only for clear error, United States v. Voccola, 99 F.3d 37, 44 (1st Cir. 1996), we _____________ _______ find that James' admission in his response to the Pre- Sentencing Report that "to the extent that his son Scott Fraza is involved in this case, it is solely due to James -13- Fraza's fault and not Scott Fraza," is enough to allow us to say again that we discern no error here. Scott complains of the court's refusal to grant a downward adjustment for his minor role in the offense, a position which was not opposed by the government. Apparently, at sentencing this brass ring was within reach when the Probation Officer interrupted the proceeding and engaged in an ex parte communication with the court some time __ _____ after which the downward adjustment was denied. According to Scott, "the Probation Officer discarded his role as . . . an impartial 'arm of the Court' and donned the mantle of an advocate for rejection of the requested 2-point deduction . . . ." Defendant's moral outrage regarding this issue was evident at oral argument, but we are perplexed as to his expectations of the Probation Officer's proper behavior. We would expect the officer to exercise his independent judgment as to the application of the guidelines and we see no error in his interruption of the proceedings to make his judgment known. See United States v. Belgard, 894 F.2d 1092, 1097 ___ _____________ _______ (9th Cir. 1990) (observing that a probation officer's duty is to "provide the trial judge with as much information as possible in order to enable the judge to make an informed decision"). Anything less would be a dereliction of duty. Scott's attempt to condemn the officer for doing his job is -14- misplaced and can not act as a basis for overturning a ruling that is not clearly erroneous. 4. Reimbursement _____________ Included in defendants' sentences was an obligation to repay the cost of their court-appointed attorneys, who had been obtained on defendants' allegation of financial inability. See 18 U.S.C. 3006A(a). To the government's ___ repeated allegation of misrepresentations in their CJA application defendants failed to respond. They did not, until threatened with contempt, even respond to the government's extensive financial report, with exhibits. The court's ultimate sentence apparently rejected their replies. Our difficulty is that the court conducted no hearing, and made no findings as to either defendant's financial viability. See United States v. Santarpio, 560 ___ ______________ _________ F.2d 448, 455 (1st Cir. 1977); cf. United States v. Chorney, ___ _____________ _______ 63 F.3d 78, 83 (1st Cir. 1995). We must remand that that be done. 5. Restitution ___________ Finally, defendants protest the court's order that they jointly and severally pay restitution to Dupont in the amount of $54,000, citing the second mortgage still held by Dupont. Restitution orders are subject to clear error review. United States v. Hensley, 91 F.3d 274, 277 (1st Cir. _____________ _______ 1996). As we noted ante, Dupont's mortgage is essentially ____ -15- worthless. If circumstances were to change, i.e, the first mortgage to disappear or land values increase to the point of validating Dupont's mortgage, defendants would be free to apply for relief from the restitution order. III. The convictions and sentences are affirmed in all ________ respects, except that the reimbursement orders are vacated. The cases are remanded for further proceedings on the matter of reimbursement in accordance herewith. -16-