UNITED STATES of America

v.

**Edward S. BUCHANAN, Defendant.**

**No. CRIM. 95-10188-NG.**

United States District Court, D. Massachusetts.

Dec. 18, 1997.

Francis J. DiMento, DiMento & Sullivan, Boston, MA, for Defendant.

Anita S. Lichtblau, William T. Clabault, Trial Atty., New England Bank Fraud Task Force, Dept. of Justice, Boston, MA, for U.S.

### MEMORANDUM AND ORDER

GERTNER, District Judge.

Edward S. Buchanan, a sixty-one year old resident of Brockton, Massachusetts, and the former president of Massachusetts Bank and Trust Company ("MBTC" or "Bank"), was charged with several financial offenses stemming from the Bank's operation between 1986 and 1992. On June 24, 1997, after a trial lasting over two weeks, a jury found Buchanan guilty of misapplication of bank funds (counts two-eight), currency structuring (count nine), and money laundering (counts ten-seventeen). Buchanan was acquitted on the charge of conspiracy (count one).[1]

---

1. The seventeen counts on which Buchanan was tried were reduced and renumbered for the jury from an indictment charging Buchanan with twenty-five counts.

The probation office and the government have argued that the guideline offense level is 24, with a sentencing range of 51–63 months. The defense contends that the Court should depart to level 8 and sentence Buchanan to probation. I have no doubt that prior to the enactment of the Federal Sentencing Guidelines, probation would have been the appropriate result.

The Guideline result is considerably more onerous, largely driven by the amount of the funds claimed to have been misapplied, and the extraordinarily strict money laundering guidelines.

After a lengthy trial, two sentencing hearings, and substantial briefing, I have concluded that the sentence appropriate under the Federal Sentencing Guidelines is 30 months. To be sure, I have strong concerns about the harshness of this sentence, but I feel compelled to reach it under a Guidelines regime. This memorandum attempts to explain why.

## I. FACTS

### A. The Offense

MBTC was a state chartered, FDIC insured, commercial bank owned almost entirely by Buchanan. In exchange for certification that all deposits in MBTC would be insured to the maximum amount provided by the Federal Deposit Insurance Act, Buchanan's bank was audited periodically by Massachusetts and FDIC regulators.[2]

Buchanan, as the Bank's effective owner, claimed the right to run the Bank his own way. By 1975, he acquired majority ownership of the Bank as well as the title of Chief Executive Officer; by 1985, he controlled more than 90% of MBTC's stock. MBTC was, he claimed, "his money, his bank." Buchanan's contacts brought in the business; his acumen made it successful. The bank he had taken over was in precarious condition, but by 1987, it was among the strongest in the region. If the needs of the shareholders were taken care of, he argued, the needs of the depositors would also be satisfied.

The FDIC disagreed. At least four bank examinations between 1984 and 1986 criti-cized the application of MBTC funds to pay for expenses of Buchanan and his family without documentation that they were bank-related; no one, however, suggested that his behavior violated any criminal laws. In 1986, the FDIC recommended that the Bank's Board of Directors vote on and obtain documentation of the benefit to the Bank of all disbursements and remuneration to Edward Buchanan, his family and his interests. Buchanan agreed to incorporate this recommendation into bank policy, as did the Board. In exchange for this agreement, FDIC representatives raised MBTC's bank rating from three to two, indicating that in the FDIC's opinion, the bank was now fundamentally sound. Thereafter, MBTC was audited less frequently.

The misapplication counts stem from a period between 1986 and 1989, during which time the bank thrived. Buchanan was able to attract significant deposits. He was also a savvy investor; the acquisition and 1987 sale of the stock of Union Warren Savings bank gave the Bank a $5 million windfall.

Flushed with success and ignoring the 1986 FDIC agreement, Buchanan charged the bank with the salaries of crew members for his 67–foot yacht, the Emerald Isle, and bought cars for his family with bank funds: a Mercedes for his daughter, Jacqueline, a Jeep Cherokee for his wife, Linda, and a $163,000 Rolls Royce Corniche for himself. For part of this period, he instructed MBTC employees to add his daughters to the payroll, and pay for their life and health insurance, although they did not actually work for the bank at the time. None of these expenditures were formally presented to the Board of Directors for their review, although in some cases, senior bank management knew of them.

From 1990 through 1992, the situation changed dramatically. A regular February 1990 examination by the FDIC uncovered the car purchases and the payroll charges, without the appropriate documentation and approvals. During the same examination, FDIC regulators learned of a $1.8 million

---

**2.** At the conclusion of federal audits, the FDIC issued a rating on a scale of 1–5 (1 is the best ranking; 5 is the worst) of the Bank's standing and internal practices.

dollar assessment levied against Buchanan by the Federal Reserve Bank for violations of the Bank Company Holding Act. By 1990, MBTC was badly exposed in the New England real estate and bank stock markets. In the last three months of 1989 the state economy went into decline, finally crashing in 1990. In March of 1990, Buchanan sold the cars in question and took his daughters and the Emerald Isle crew members off the bank payroll. Between 1990 and 1992, the FDIC downgraded MBTC to its lowest possible rating. In July of 1992, the FDIC caused the Bank to close.[3]

The events that gave rise to the money laundering and structuring charges occurred in June and July of 1992, when the bank's fortunes were in decline, and at a time when it was subject to strict regulatory supervision. The charges stem from a $50,000 check, received by Buchanan, in settlement of a malpractice claim brought by MBTC, Buchanan and Jerome Harriman, Executive Vice President of the Bank, which Buchanan appropriated, broke down into smaller checks payable to fictitious people, and then cashed, each in amounts under $10,000 over a period of several weeks.

#### B. *The Offender*

Edward Buchanan has been a banker for his entire professional life. He began his career as a cashier, later became a treasurer at Liberty Bank and Trust Company and ultimately purchased a controlling share of the holding company that owned MBTC. Buchanan is married to his second wife, Linda, although the two are currently separated. Buchanan has two children from his first marriage, Jacqueline, 32, and Mary, 34.

The Court has received numerous letters from family members, community leaders, and business associates attesting to his good character, the contributions he has made to the Brockton community in which the Bank is located, and his close relationship with his family.

3. The government is not claiming that the downgrading of the bank, or indeed its closing, was

In all respects—apart from the accusations that form the basis of this prosecution—Buchanan has lived an exemplary life.

### II. *A PRE–GUIDELINES PERSPECTIVE*

Before the enactment of the Sentencing Guidelines, I have no doubt that Mr. Buchanan would have received a considerably lower sentence than the range being contemplated today. Indeed, probation would have been the most likely outcome. He is a first offender; at 62 years old, even in good health, prison is likely to be an extraordinarily difficult experience. He has already been punished; the bank into which he had poured his life is closed and he is ruined. He now has the stigma of a felony criminal conviction.

By any measure of the core purposes of sentencing—rehabilitation, deterrence, retribution—there is no need for a sentence of fifty-one (51) months. Once the proud owner of a thriving bank, Mr. Buchanan's precipitous fall serves as a deterrent to others. Concerns about retribution can be met by a substantial fine or restitution; pre-Guidelines, the Court may well have said: "He has suffered enough." He plainly has. There is no chance that Buchanan will repeat his criminal conduct because he has no business left to run.

But the Guidelines have changed the calculus. On the one hand 18 U.S.C. § 3553(a)(2) teaches that the general purposes of sentencing are unchanged. At the same time, § 3553(b) admonishes me to sentence the defendant expressly according to the Guidelines, policy statements, and the commentary of the Sentencing Commission. Nowhere in those materials promulgated by the Commission is there room for a departure to probation based on the very general concerns I have outlined.

In fact, whatever else the Guidelines were intended to do, one thing is clear: Sentences for offenders convicted of economic crimes were supposed to increase. Short sentences were to be substituted for probation for comparable offenses. The Guidelines aim to

due to Buchanan's misapplication of funds.

minimize the distinction between those who rob on the street with a gun, and those who rob in the boardroom with a fountain pen. The Commission was concerned that too many offenders guilty of certain economic crimes were sentenced to probation not prison.[4]

This case, however, is not so simple as the embezzlement of bank funds, the classic robbery with a fountain pen.

First, most of the misapplication charges are what I describe as crimes of characterization. They began as the concerns of the regulators about the way Buchanan ran the Bank. Prior to 1990, they were only recommendations; on balance, the Bank was doing well. Buchanan's greatest excesses came in a period in which depositors and shareholder's alike benefitted from a strong economy and MBTC's robust performance; there was no suggestion that he was behaving in ways that were criminal. While some of the 1990 revelations were made the subject of a criminal referral to the United States Attorney's office, it is not at all clear that Buchanan would have been prosecuted for misapplication of MBTC funds had the bank continued to flourish vis-a-vis other regional banks.

Second, in some cases—not all—Buchanan's "misapplications" of bank funds, as the jury found, also provided a benefit to MBTC. Although Buchanan was not entitled to use bank funds to pay his family's expenses when they never or no longer worked for the Bank, he was entitled to a car, and to a budget for entertainment. After all, he was the exclusive source of the bank's phenomenal growth. At least with respect to Buchanan's car and

the boat expenses, the issue is degree, not kind—the *extent* to which they benefitted the bank, not whether they were *totally* bank related or *totally* personal. In some respects, the misapplications were characterized as criminal only in hindsight, when the economy had deteriorated and when other, far worse, misconduct by Buchanan had surfaced.

## III. THE GUIDELINES

Four issues drive the guidelines calculation: a) the valuation of the misapplication counts, b) offense levels for money laundering, c) the grouping issue, whether the structuring and money laundering counts may be grouped with the misapplication counts, and d) the absence of other grounds for departure.

Probation, with which the government agrees, recommends a sentence of 51 months based on the following calculation:

### Group I (The Misapplication Counts)

| | |
|---|---|
| Base Offense level (2B1.1(a)) | + 4 |
| Specific Offense Characteristics, a loss of $502,401 (2B1.1(b)(1)(M) (when the loss is more than $500,000)) | + 12 |
| More than Minimal Planning under 2B1.1(b)(4)(A) | + 2 |
| Abuse of Trust under 3B1.3 | + 2 |
| Abuse of Trust under 3B1.3 | + 2 |
| **Adjusted Offense Level (subtotal)** | **+ 20** |

### Group II (the Structuring and Money Laundering Counts)

#### A. Structuring

| | |
|---|---|
| Base Offense Level under 2S1.3 | + 6 |
| Specific Offense Characteristics the value of funds under 2F1.1(b)(1)(F) | + 5 |
| Knowing these were the proceeds of unlawful activity 2S1.3(b)(1) | + 2 |
| Abuse of Trust under 2B1.3 | + 2 |
| **Adjusted Offense Level (subtotal)** | **+ 15** |

4. Pre-guidelines, "[m]ost judges believe[d] that the suffering experienced by a white-collar person as a result of apprehension, public indictment, and conviction as well as the collateral disabilities incident to each—loss of job, revoca-·tion of a professional license, diminishment of status in the community—[was] itself a kind of punishment. They wonder[ed] whether the imposition of additional suffering [was] justifiable and warranted."

Wheeler, Mann, and Sarat, *Sitting in Judgment: The Sentencing of White Collar Criminals*, at 144–145 (1988).

It was precisely that kind of thinking that the Guidelines sought to limit:

> The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as

fraud, and other similar common law crimes, such as theft. The Commission's statistics indicated that where white-collar fraud was involved, courts granted probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation. To mitigate these discrepancies, the Commission decided to require short but certain terms of confinement for many white-collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

Breyer, *The Federal Sentencing Guidelines and the Key Compromises on Which They Rest*, 17 Hofstra L.Rev. 1, 19 (1988).

## B. Money Laundering

| | |
|---|---|
| Base Offense Level under 2S1.1 | + 20 |
| Abuse of trust | + 2 |
| Adjusted Offense Level (subtotal) | + 22 |

### Multiple Count Adjustment to the Highest Offense Level of Group 2 Under 2S1.1, 3D1.4:

| | |
|---|---|
| Group 1 Adjusted Offense Level 1 unit | 20 |
| Group 2 Adjusted Offense Level 1 unit | 22 |
| Greater of the Adjusted Offense Level | 22 |
| Increase in the Offense Level as per 3D1.4 | 2 |
| Combined Adjusted Offense Level | 24 |

This leads to a range of 51–63 months, for a first offender.

Counsel for the defendant contests both the government's groupings and the offense level computations. Accordingly, the defendant requests that this court depart to offense level 8 for sentencing purposes.

### A. Misapplication

To find Buchanan guilty of the misapplication of bank funds, the jury had to have found that Buchanan willfully misapplied and caused to be misapplied MBTC money and funds, with the intent to injure or defraud the bank.

The relevant base offense level under USSG § 2B1.1 is level 4.[5] The pre-sentence report calculates the loss resulting from the misapplication offenses at approximately $502,000, resulting in an increase of twelve levels. The premise of this approach is that all of the funds at issue in the misapplication count were appropriated to Buchanan's personal use.

The defendant takes the polar opposite position. Reiterating the argument the jury rejected, he insists that his misapplication of bank funds created "no loss" since any diminution in MBTC's assets simply meant that Buchanan availed himself of money to which he would have been entitled at a later date through dividends or stock issues he would have received as the sole owner of the bank. There was, he contends, no distinction between Buchanan and the bank.

Both sides overstate the case. The defense confuses the distinction between Buchanan as a stockholder and the Bank as a corporate entity, insured by the FDIC and governed by a Board of Directors. By misapplying funds, Buchanan assigned to himself wholly corporate assets. To do so impermissibly suggested that a sole shareholder may benefit from federal insurance and the protection of a corporation without incurring personal obligations. In a heavily regulated industry, Buchanan's claim is misguided.

The government, however, suggests that the Bank got absolutely nothing of value from Buchanan's expenditures that can be deducted from the defendant's misapplication totals under the Guidelines. In fact, Buchanan's acts, they argue, are no different from the acts of someone who absconds with funds for his own personal benefit, and then, when the jig is up, repays them. The offender's intent was to permanently deprive the bank of property; he did so for a period of time, during which the victim was wholly without the use of the property; the bank/victim ultimately escaped loss just because the money was repaid.

The relevant analogy, the government suggests, is application note 2 to § 2B1.1: "In the case of a defendant apprehended taking a vehicle, the loss is the value of the vehicle even if the vehicle is recovered immediately." Likewise, in United States v. Bennett, 37 F.3d 687, 695 (1st Cir.1994) and United States v. Fraza, 106 F.3d 1050, 1055 (1st Cir.1997), the Court held that the repayment of a loan by the defendant after a bank or other authority discovers the fraud cannot be offset against the loss.[6]

The analogy is misplaced. The examples offered are zero-sum contests, in which the offender makes use of the absconded property to the complete exclusion of the victim/bank. The instant case is more complex in two respects. First, while Buchanan made use of certain of the cars, for example, MBTC held title to them, carried them on

---

**5.** There is no merit to Mr. Buchanan's suggestion that USSG § 2F1.1 should govern the misapplication counts. Section 2F1.1 plainly deals with loans and credit card applications.

**6.** The policy is a sensible one: wealthy defendants may not escape accountability for their crimes by later making the victims whole.

their books as an asset, and depreciated them.[7] Second, as to at least two items, the Rolls–Royce and the boat, the government concedes that even while Buchanan was using them, the Bank benefitted to a degree.

The government's concession is not inconsistent with the jury's finding that Buchanan "wrongfully and willfully misapplied monies or funds belonging to or entrusted to the bank." The jury was not asked to disentangle what precise portion of the funds benefitted the bank and what did not. The guilty verdict would be sustainable if, to any degree, bank funds were used to finance a venture which only partially benefitted the Bank. In contrast, I must disentangle the personal from the business, and assign a value to the personal benefit because the Sentencing Guidelines, to a degree, reflect those amounts.

█ The sentencing offense level is set to reflect the exact value of the loss. The burden lies with the government to prove the loss with sufficient certainty, *United States v. McAlpine*, 32 F.3d 484, 487 (10th Cir.1994). That burden is especially significant here given the substantial impact the government's calculations will have on the defendant's liberty. USSG § 2B1.1, comment (n. 3) indicates that if the loss cannot be determined with precision I may use a "reasonable estimate" given the available information.

On the record before me, I find that the government has not met its burden with respect to two of seven counts of misapplication. As noted below, I cannot generate a "reasonable estimate" as to the loss to the Bank of Buchanan's misapplication of funds to purchase the Rolls Royce and to provide salaries to members of the Emerald Isle crew. Absent those items, I find the loss to be approximately $133,000, within the USSG § 2B1.1(b)(1)(J) $120,000 and $200,000 range.

7. The cars were purchased with bank funds. Title was held in Buchanan's name, but stored in the bank's safes. There is no question that when they were sold, the proceeds went to the Bank. Likewise there is no question that the Bank treated the cars as its own assets on the Bank's books.

8. In April of 1990, Buchanan, Harriman and MBTC filed a legal malpractice suit against the law firm of Hinckley, Allen, Snyder & Comen.

### i) *Ghost Employment*

█ There is no issue with respect to MBTC's expenditures for the phantom employment of Buchanan's children. The Bank simply got no value for its money. All ghost wages and policy premiums paid to Jacqueline and Mary, totalling $48,000, redounded solely to the benefit of Buchanan's family.

### ii) *The $50,000.00 Settlement Check*

█ As a director and majority shareholder of MBTC, Buchanan owed a fiduciary duty to the corporation. By taking the $50,000 check that was part of the settlement of the case that he, Harriman and the Bank had brought against certain lawyers who had represented them in the Federal Reserve Proceeding,[8] Buchanan deprived the corporation of an opportunity to dispose of the money. And, while Buchanan claimed that he was entitled to the money and that the Bank was obliged by law to indemnify him for the legal fees he had incurred, the jury rejected his claim. No theory was presented to the jury or this Court by which Buchanan was entitled only to part of the proceeds, and the Bank the rest. Either it was right to take the money because the Bank owed Buchanan indemnification, or it was not. The jury found it was not. Buchanan is responsible for the full $50,000 for valuation purposes.

### iii) *The Cars*

MBTC owned nine cars for its senior officers. Four cars were used by Buchanan and his family, including a 1987 Mercedes 560 bought for Buchanan that the prosecution has never challenged. The jury found that Buchanan misapplied funds for three cars: the 1987 Mercedes 190E driven by Jacqueline valued at roughly $28,000, the 1988 Jeep Cherokee used by Linda Buchanan valued at $26,000 and the 1987 Rolls Royce Corniche convertible worth $163,000.

The plaintiffs sued to recover losses MBTC had sustained by investing in the stock of other New England banks in a way which the Federal Reserve found to be unlawful. Hinckley, Allen countersued for unpaid legal fees. The case was settled for $50,000, paid to the three plaintiffs. Buchanan signed Harriman's name, cashed the check, and structured the proceeds.

### a. *The Cars for Jacqueline and Linda Buchanan*

█ Bank funds were used to purchase Jacqueline Buchanan's Mercedes and Linda Buchanan's Jeep. As with the Rolls, while the title was in Buchanan's name, the papers were kept in the Bank's vaults. The Bank took depreciation for the assets. When the cars were sold, the Bank got the benefit of the proceeds. In effect, then, the Bank continued to use the cars at the very least as an asset; what it lost during the period of time that Jacqueline and Linda drove the cars, without being bank employees, was the car's use. And one measure of that use is the car's decline in value between the time of purchase and the time of sale.

The Mercedes and Jeep were sold for approximately $19,000. I find therefore that the misappropriated value of the Mercedes and Jeep total $35,000.

### b. *The Rolls Royce*

█ Buchanan bought the Rolls Royce from Lauderdale Imports in Fort Lauderdale with a $153,375 MBTC Treasurer's check. Like the other cars, title was issued in Buchanan's name, but the papers remained in the Bank's vault. Although Buchanan used the car, the Rolls was a bank asset and investment carried on its books. Buchanan sold the car for $90,000 (which was returned to the bank) in January 1991, just after the FDIC wrote it off as a loss in its January 1991 audit of MBTC.

As a bank president, Buchanan was entitled to a car, indeed, not to just any old car, like a Taurus or a Chevrolet. He was entitled to a prestigious car. It is significant that the government has no quarrel with the Mercedes purchased before the Rolls Royce. Somehow the Mercedes was enough, and the Rolls too much.

The jury agreed that the Rolls expenditure was excessive, that it represented a misapplication of bank funds. Again, my job at sentencing is more precise. I am obliged to determine to what degree, in what amount, this expenditure was excessive.

Plainly, the Bank got some value from the car; it was able to sell it for $90,000. And even before the sale, the Bank benefitted from it to some degree; Buchanan used it as a mode of transportation on rare occasions, and as an advertising tool, to show off his success. I credit Buchanan's testimony that there was a relationship between his appearance— panache, if you will—and promoting the Bank. Since Buchanan had a right to a car and even a prestigious car, and since the government cannot meet its burden of determining what was a business benefit and what was not, I will discount this expenditure.

### iv) *The Emerald Isle*

█ The Emerald Isle was a 67-foot luxury yacht purchased by Buchanan in May of 1984.[9] First Massachusetts Leasing Corporation, owned and controlled by Buchanan, held title to the yacht. In June of 1986, Buchanan directed MBTC employees to put Emerald Isle crew members on the bank's payroll, without the knowledge or consent of the Board of Directors.

There is no question that Buchanan used the boat for both business and pleasure. I credit Linda Buchanan and Jerome Harriman's testimony that business was conducted on the yacht, including MBTC board meetings and the entertainment of bank customers. Indeed, at one point, when the Bank held an ownership interest in the boat, the FDIC, rather than suggesting that this was an entirely inappropriate expenditure, simply recommended that the Bank turn its equitable interest into a loan.

The Emerald Isle was the last in a succession of boats owned by Buchanan, each used, at least in part, for business entertainment. In the past, the Bank paid Buchanan for the business use of his boat. In the case of the Emerald Isle, Buchanan contends, and there is no opposition, that the salary of the crew members was less than what it would have cost the Bank had he charged for the boat's use as in the past. And, although the Bank got value from the yacht, Buchanan himself absorbed $956,000 worth of expenses.[10]

---

9. The parties disagreed about the "luxury" nature of the yacht. It was variously described as a "floating cocktail lounge" and a "nice craft with crowded bedrooms."

10. The government contends that the yacht was used for business purposes less than 10% of the time, *in toto*, but fails to address the defendant's assertion that the yacht was frequently idle. Of

While it may be have been wrong for Buchanan to pay the salaries without express Board approval, it is clear that the bank received some value from the yacht's operation; precisely how much is difficult to establish on this record. The government has not done so at all. As a result, I will discount this item as well.

In sum, I find Buchanan responsible for misapplication resulting in the following general amounts:

| | |
|---|---|
| $48,000.00 | in ghost employment of his daughters |
| $ 50,000.00 | misappropriation of the settlement check |
| $ 35,000.00 | in lost use value of the Jeep and Mercedes |
| $133,000.00 | total |

The $133,000 figure lies squarely within the USSG § 2B1.1(b)(1)(J) range of $120,-000–$200,000. Even if I were to assign a portion of the Emerald Isle costs to Buchanan's misappropriation or the Rolls–Royce, that figure would not exceed $200,000.

The base offense level of 4 is therefore enhanced by 9 levels in accordance with USSG § 2B1.1(1)(J). Two additional levels are added for more than minimal planning, USSG § 2B1.1(4), and two for an abuse of trust, per USSG § 3B1.3. The corresponding offense total for misapplication is 17.

### B. *Structuring*

The jury found Buchanan guilty of structuring the $50,000 settlement check as defined by USSG § 2S1.3. The jury's finding is consistent with the instructions: to have found Buchanan guilty of structuring, the jury must have concluded that: i) Mr. Buchanan knew of a financial institutions's duty to report currency transactions in excess of $10,000 and knew that structuring transactions to avoid the requirement is unlawful; ii)

with such knowledge, Mr. Buchanan knowingly and willfully structured or assisted in structuring a. currency transaction; iii) that the purpose of the structured transaction was to evade the transaction reporting requirement; iv) that the structured transaction involved one or more domestic financial institutions; and, v) that the currency transaction constituted "enhanced structuring" by furthering another violation of federal law, here, the misapplication of the $50,000 check.

In attempting to evade reporting requirements, Buchanan committed a crime that is measured by the full amount in controversy. The base offense level for structuring is 6; the $50,000 offense adds 5 additional levels per USSG § 2F1.1(b)(1)(F).

Buchanan's role in the offense warrants a two level enhancement, as does his abuse of trust associated with the commission of the offense. The defendant claims there was no abuse of trust and that the check cashing was a function of his role as a good customer, not an employer. I disagree. Instructing an employee of the bank to draft checks to fictitious persons is a paradigmatic example of abuse of trust. Accordingly, I calculate the structuring offense at a level 15.

### C. *Money Laundering*

The jury convicted Buchanan of counts 10–17 money laundering in connection with the eight "Green" checks. Money laundering within the meaning of USSG § 2S1.1, carries with it a base offense level of 20. The government seeks an additional two level enhancement per USSG § 3B1.3 to reflect Buchanan's abuse of trust, bringing the money laundering charges to an offense level of 22.[11]

---

the time it was used at all, for anything, the proportion of business use was at a much higher level.

**11.** Although it is not necessary to address this issue because I am departing from the money laundering guidelines on other grounds, I note that I have concerns about the government's assertion that Buchanan committed an abuse of trust within the meaning of USSG § 3B1.3. It would be impossible to imagine a case of money laundering by a bank executive that would not

involve the officer's position. Money laundering describes the wrongful conversion of illegally obtained funds into untraceable currency. Unlike structuring, money laundering covers the conversion outcome, not the process by which it occurs. In this case, Buchanan gained access to the settlement check because he was a litigant in the suit, not because of his position of trust. By breaking down the check, Buchanan committed structuring and abused his position in getting an employee to cut the check in the name of the "Green" family. Buchanan then laundered the money by cashing the checks but that offense

■ The money laundering calculation dramatically increases Buchanan's offense level. In my judgment, the Guidelines level substantially overstates the seriousness of Buchanan's conduct, and thereby necessitates a departure.

The base offense level of 20 for money laundering is intended to reflect the gravity of financial transactions that are independent of serious large scale criminal activity, like drug trafficking or "mob" extortion. It is based on Congress' view that money laundering has the effect of promoting such activity or obscuring the origins of illicit funds. In the instant case, there was no other independent, serious criminal activity, obscured by the money laundering or advanced by it. There were no drugs, no allegations of "mob influence." The amounts at issue are relatively small.[12] Money laundering here was solely a byproduct of structuring. Indeed, if Buchanan had not written the checks out in the name of "Green," if he used his own name, there would be no money laundering charge at all.

While the decision to break down the settlement check—the structuring—corresponds to an offense level of fifteen, cashing the "Green" checks suddenly ratchets the offense computation seven levels higher. This is especially troubling since each of the essential elements of money laundering are present in the structuring analysis—with strikingly different results.

The Congressional record is clear: Congress intended that the money laundering statute help combat the large amounts of money "laundered" by the drug trade and organized crime. See, e.g., S.Rep. No. 433, 99th Cong., 2d Sess. 4 (1986).[13] The money

laundering offense levels contemplate heavy punishments for individuals who turn unlawfully obtained money into untraceable currency. As a consequence, "the punishment is higher than that specified in § 2S1.2 [engaging in monetary transaction in property derived from specified unlawful activity] and § 2S1.3 [structuring] because of the higher statutory maximum, and the added elements as to source of funds, knowledge, and intent." USSG § 2S1.1, comment. (backg'd.) The heartland of the offense is characterized by the knowing conversion of large sums of money from illegal transactions, like drug trafficking or mob activities. The fact that commentary to the Guidelines expressly refers to the Anti–Drug Abuse Act lends further support to the notion that the drug and organized crime cases are at the core of the money laundering Guidelines. See id. n. 12.

Since the enactment of the Guidelines, other courts have come to similar conclusions—that the case before them is not within the heartland of USSG § 2S1.1. In United States v. Walters, 87 F.3d 663, 672 (5th Cir. 1996), cert. denied, —— U.S. ——, 117 S.Ct. 498, 136 L.Ed.2d 390 (1996), the defendant was convicted of mail fraud, money laundering and conspiracy. The district court departed to 24 months from the guideline range of 30–37 months. The Fifth Circuit affirmed, noting that a "downward departure ... is not disproportionate in light of the district court's conclusion that the guideline calculation overstates the seriousness of [defendant's] involvement." United States v. Ferrouillet, 1997 WL 266627 (E.D.La.1997), provides another example of a district court judge departing after finding that "[the] guidelines were intended for large scale criminal operations involving sizable amounts

was unrelated to the defendant's position. The Court has seen no evidence that there was a causal relationship between the crime of money laundering and Buchanan's position.

**12.** The amounts in controversy in typical money laundering cases are different from the case at bar. The Guidelines for money laundering enhancements start over $100,000 and provides offense level increases up to $100,000,000. In contrast, structuring and misapplication are governed by the fraud table at USSG § 2B1.1(b)(1)(A)–(U) providing for enhancements from $100—$80,000,000. Here, Buchanan's of-

fense falls well short of the $100,000 minimum required to trigger offense level enhancements under the money laundering statute.

**13.** The statute governed by the guideline is a part of the Anti–Drug Abuse Act of 1986, and prohibits financial transactions involving funds that are the proceeds of specified unlawful activity. "The amount of money involved is included as a factor because it is an indicator of the magnitude of the criminal enterprise, and the extent to which the defendant aided the enterprise." USSG § 2S1.1, comment. (backg'd.)

of money" and were inapplicable to the crime of an illegal campaign contribution.

Judicial dissatisfaction with the base level offense application for money laundering is particularly acute in cases that do not involve drugs. In *United States v. Caba,* 911 F.Supp. 630, 636 (E.D.N.Y.), *aff'd,* 104 F.3d 354 (2d Cir.1996), the defendant was convicted of food stamp fraud and money laundering. Caba unlawfully acquired food stamps; by depositing the proceeds into a bank account, Caba also became guilty of money laundering. The Court held that the "crime [t]here [was] not the type of major money laundering fraud that would warrant a 10 to 12 year jail sentence. The ... relationship with [drug crimes] drives the guidelines level and would in this case produce a custodial range that grossly exaggerates the seriousness of the actual conduct." *See also United States v. Bart,* 973 F.Supp. 691 (E.D.Tex. 1997).[14]

Taken as a whole, I conclude that the crime committed here falls well outside the "heartland" of money laundering cases, and that those guidelines dramatically overstate the seriousness of Buchanan's conduct. Since I find Buchanan's money laundering acts virtually indistinguishable from his structuring acts, I will depart to 15 in order to harmonize the money laundering and structuring offense levels.

### D. *Grouping*

Probation has classed counts 2–8, the misapplication of funds, as Group 1 offenses. Count 9, structuring, and counts 10–17, money laundering, are classed together as Group 2. As a result, under USSG § 3D1.4, probation recommends that the offense level be increased by 2.

Similar offenses are grouped together where they are part of a common scheme that injures a common victim, USSG § 3D1.2. To satisfy § 3D1.2(b), the counts must involve the same victim and be connected by a common plan or objective. The government argues for a two group classification—misapplication on the one hand, and money laundering/structuring, on the other— for both reasons. Buchanan's offenses, it claims, created two victims, society and the FDIC. In addition, the government contends that Buchanan's convictions for misapplication and money laundering/structuring do not involve a common scheme. I disagree with the government's contention that there are two victims here but I agree that the misapplication counts upon which Buchanan was convicted constitute a separate scheme.

### a. *Two Victims*

In *U.S. v. Lombardi,* 5 F.3d 568, 570 (1st Cir.1993)[15] the grouping of fraud and money laundering offenses was expressly disallowed because the Court found different victims. The court found that "[s]ubsection (b) applies when there is the same victim and multiple acts or transactions that have a common objective or comprise a common plan. The guidelines are clear that, for purposes of these subsections, the victim of fraud is the insurance company and the victim of money laundering is society."

■ Buchanan's behavior, in contrast, created a single victim variously called the FDIC, the government or the public. The government must do more than assert that the FDIC by acting as a receiver for MBTC in its corporate capacity was somehow like a private party. It must allege some kind of

---

**14.** The United States Sentencing Commission has also expressed concern that the money laundering offense level is applied too rigidly and to cases for which it was not intended. *See* "September 18, 1997 Report to Congress on Sentencing Policy for Money Laundering Offenses." But Congress has thus far declined to amend the money laundering statute and there is nothing to suggest that debate alone is grounds to treat this offense less seriously than the guidelines, *United States v. Sanchez,* 81 F.3d 9 (1st Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 201, 136 L.Ed.2d 137 (1996) (where the Commission proposed lowering crack sentences but Congress had dis-

approved the suggestion, the discrepancy was not a basis for departure). Significantly, however, the U.S. Sentencing Commission's report reveals that in 1996, courts departed in 10.3% of all cases but in 15.4% of non-drug money laundering cases.

**15.** *But cf. United States v. Leonard,* 61 F.3d 1181 (5th Cir.1995) (permitting grouping of fraud and money laundering offenses because offenses were a "single integrated scheme to obtain money from elderly victims").

harm deriving from this status, distinct from society at large. It did not. There is one victim here and it is the public.

### b. *Common Scheme*

To prevail on his claim of grouped offenses, however, the defendant must also convince the Court that his misapplication offenses (violations of the banking regulations committed between 1986 and 1991 according to the government) form a sufficiently tight nexus with the 1992 structuring and laundering schemes to constitute a common scheme or objective. In support of this proposition, the defendant cites *U.S. v. Mizrachi*, 48 F.3d 651, 655 (2d Cir.1995), where the defendant planned from the outset, to borrow certain money by fraud, to buy a building, to destroy it, collect the insurance, pay off the loan, and pocket the difference between the insurance proceeds and the loan.

■ Buchanan's case is different. Most of the misapplication offenses (the cars, the ghost employment, the yacht) occurred at a different time, both chronologically and in terms of the Bank's fortunes. The only misapplication charge that flowed directly into the structuring and money laundering offense was the misapplication of the bank settlement check.

The schemes involving the vehicles and the ghost employment were conceptually distinct from the misapplication, structuring and money laundering of the $50,000 check. The application of Bank funds for cars, ghost employment and the yacht were part of Buchanan's approach to the Bank—"my money, my bank"—about which he was quite open. Though the Board of Directors claimed not to have known about these expenditures, senior bank management surely did. The expenditures occurred at a time when the bank was thriving and Buchanan wanted to show off that success.

In contrast, the settlement check/structuring/money laundering scheme was done covertly—signing Harriman's name to the check, structuring it, cashing the check in false names. It occurred when the bank was in distress. While Buchanan's rationale for his actions may have been similar, that he had a right to the funds, the scheme was entirely different.

Accordingly, I agree that it is appropriate to group the misapplication counts on the one hand, and the money laundering/structuring counts on the other. As a result, an additional two level grouping enhancement shall be added to the highest offense level present in this case. The highest offense level is 17, with the two level enhancement, the final calculation is 19.

### E. *Additional Grounds for Departure*

■ Given my concern that the sentence, even at offense level nineteen, is onerous under the circumstances, I looked carefully at the arguments for departure. None fits the facts of this case.

### a. *Koon*

In *Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), the Court held that the district courts are free to depart downward from the otherwise applicable guideline range on account of any mitigating factor or combination of factors which makes the case unusual, unless expressly prohibited by law. I have searched in vain for such factors.

In *United States v. Grandmaison*, 77 F.3d 555 (1st Cir.1996), the Court held that departures were appropriate if the record suggested that the offense conduct represented aberrant behavior in an otherwise exemplary record. *Grandmaison* involved a first offender who ran afoul of mail fraud and campaign finance laws. If Buchanan's conduct from 1986 through 1990 was illegal, as the jury found, that it is difficult to label it aberrant. It was not a momentary slip. The defendant then and now takes the position that he was entirely justified in applying bank funds as he did.

In *United States v. Sklar*, 920 F.2d 107 (1st Cir.1990) the Court found that a downward departure is warranted for extraordinary rehabilitation to a degree not taken into account by an acceptance of responsibility reduction. Again, this does not apply. Buchanan insists that he was right; there has

been no acceptance of responsibility at all, and hence, no rehabilitation.

I have inquired of probation and Buchanan's doctors about his medical condition, or his family situation. *See* USSG Ch. 5, Pt. H, intro. comment. While Buchanan's physician has some concerns, there is nothing about his medical condition that would prevent him from remaining healthy in prison. Moreover, nothing about his family obligations is extraordinary. *Cf. United States v. Hilton,* 946 F.2d 955 (1st Cir.1991).

I have inquired about where Mr. Buchanan would be incarcerated, and whether a lower sentence would make a difference in that determination. I have been informed that the length of sentence will not determine his classification.

Finally, I have considered whether there is any room in the Guidelines for my sense that Mr. Buchanan "has suffered enough," that imprisonment is unnecessary to accomplish the goals of sentencing. Unfortunately, as I noted at the outset of this opinion, that is precisely the argument that the Guidelines disdains. *See United States v. Michael Jackson,* 30 F.3d 199 (1st Cir.1994) (sentencing court's belief that twenty-seven year sentence was excessive was not proper basis for guidelines departures).

## IV. *CONCLUSION*

The offense computation is as follows:

| | |
|---|---|
| § 2B1.1 (base offense level) | 4 |
| § 2B1.1(b)(1)(J) (loss of $133,000) | 9 |
| § 2B1.1(4)(A) (*more than minimal planning*) | 2 |
| § 3B1.3 (abuse of position of trust) | 2 |
| **Misapplication total offense level** | **17** |

| | |
|---|---|
| § 2S1.3 (base offense level) | 6 |
| § 2S1.1(b)(1)(F) (structuring of $50,000) | 5 |
| § 2S1.3(b)(1) (proceeds of unlawful activity) | 2 |
| § 3B1.3 (abuse of position of trust) | 2 |
| **Structuring total offense level** | **15** |

| | |
|---|---|
| § 2S1.1(2) (base offense level) | 20 |
| (departure to align with structuring) | −5 |
| **Money Laundering Offense Total** | **15** |

Under USSG § 2B1.1, misapplication plus enhancements yields an offense level of 17 which is the highest offense level category. There is a two level increase per USSG § 3D1.4 because of the grouping analysis.

---

**16.** The restitution figure reflects the total losses calculated by the probation office rather than the

Buchanan's final offense total is 19. The sentencing table prescribes a custodial range of 30–37 months for an individual in the defendant's Offense Level 19/Criminal History Category I class. I choose to sentence the defendant to the lowest number in the range.

Edward Buchanan is hereby sentenced to thirty (30) months of imprisonment. In addition, Edward Buchanan is sentenced to three years of supervised release, with various conditions announced in open court. Restitution is set at $134,950;[16] a fine at $10,000 and special assessments at $800.

**SO ORDERED.**

rounded figures used to compute the misapplication offense level.